UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6-4-13
```

------------------------------------X

DEWITT STERN GROUP, INC.,

                    Plaintiffs,

                                        13 Civ. 3060 (RWS)

     - against -

                                        MEMORANDUM
                                        OPINION &
                                        ORDER
RICHARD EISENBERG,

                    Defendant.


------------------------------------X



A P P E A R A N C E S:


          Attorney for Plaintiff DeWitt

          GOLDBERG SEGALLA LLP
          780 Third Avenue, Suite 3100
          New York, NY  10017
          By:  Peter J. Biging, Esq.


          Attorney for Defendant Eisenberg

          OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
          1745 Broadway, 22nd Floor
          New York, NY  10019
          By:  Aaron Warshaw

**Sweet, D.J.**

Plaintiff DeWitt Stern Group Inc. ("DeWitt" or "Plaintiff") has moved by order to show cause for a preliminary injunction to prohibit its former employee, Richard Eisenberg ("Mr. Eisenberg" or "Defendant"), from violating Defendant's Employment Agreement, in particular with respect to the confidentiality and non-solicitation provisions. For the reasons set forth below, Plaintiff's motion for a preliminary injunction is granted to the extent it prohibits Defendant from future violations of the Employee Agreement.

**THE PARTIES**

DeWitt is a privately held insurance brokerage and risk management firm, specializing (in part) in insurance for the entertainment industry, with its primary place of business operations and senior management located in New York. (Memo. Opp. at 4.)

Mr. Eisenberg is an established insurance broker. (Affidavit of Richard Eisenberg ("Eisenberg Aff."); ¶ 2-8.) From 2007 until May 6, 2013, Mr. Eisenberg was employed by DeWitt as a Senior Vice President and producer, with his primary

1

responsibility to sell film insurance products and oversee the
handling of client accounts. (Memo. at 5.)   Mr. Eisenberg is
currently employed by Arthur J. Gallagher & Co. ("Gallagher").
(*Id.*)

**FACTS**

Prior to Mr. Eisenberg's employment at DeWitt, he worked at
Aon/AGRIS from 2001 until 2007. (Eisenberg Aff. ¶¶ 3, 10.) When
Mr. Eisenberg joined Aon/AGRIS, he was compensated for the sale
of his business, client accounts and goodwill in the amount of
$400,000. (Declaration of Charles Johnson, ("Johnson Decl."); ¶
5.) His employment with Aon/AGRIS therefore contained
restrictive covenants preventing him from soliciting these
clients for another firm, or competing with them if he were to
terminate his agreement. (*Id.*)

In 2007, Mr. Eisenberg left Aon/AGRIS and joined DeWitt,
and shortly thereafter Aon/AGRIS filed a Cross-Complaint against
DeWitt and Mr. Eisenberg alleging, among other things, that Mr.
Eisenberg had breached the restrictive covenant provisions in
his agreement, and that DeWitt had raided and tortuously
interfered with its business by convincing customers to abandon
their relationships with Aon/AGRIS and move instead to DeWitt.

(Biging Decl. ¶¶ 14, 18.)   DeWitt alleges that in order to free Mr. Eisenberg from the restraints imposed by his contract with Aon/AGRIS, and to permit Mr. Eisenberg to lawfully solicit his former clients for DeWitt, DeWitt entered into a settlement with Aon/AGRIS in which DeWitt paid Aon/AGRIS $425,000.   (Johnson Decl. ¶ 6.)   According to DeWitt, as a result of this settlement, which Mr. Eisenberg signed, Mr. Eisenberg was permitted to solicit the business he had sold to Aon/AGRIS for DeWitt and continue cultivating these relationships on behalf of DeWitt. (*Id.* at ¶¶ 7-8.)

After Mr. Eisenberg joined DeWitt, Plaintiff alleges that Mr. Eisenberg, in his capacity as Senior Vice President and producer, had access to DeWitt's confidential information and trade secrets, including names and lists of accounts and clients, names of key account contacts, account characteristics, pricing information, and application information.   Further, DeWitt asserts that in the course of his work for DeWitt, Mr. Eisenberg was provided substantial support in his efforts to make former Aon/AGRIS clients DeWitt clients, thereby building his book of business, including: (1) substantial compensation on commissions earned on the business; (2) two full-time employees to assist him in servicing any business he could bring in; (3)

3

offices he could work out of on both coasts; and (4) an apartment
in California, half of which was paid for by DeWitt so he could
develop clients on the west coast.  (*Id.* at ¶ 8.)

Mr. Eisenberg also signed a series of employment agreements
with DeWitt, including his final agreement executed on or about
October 9, 2012 (the "Employment Agreement").  (Declaration of
Peter S. Biging, ("Biging Decl.").)  The Employment Agreement in
Paragraph 5(a) states that "by signing this Agreement, Employee
acknowledges and agrees that the restrictive covenants contained
in this Agreement are reasonably necessary to protect Company's
business interests and that during and after the term of this
Agreement Employee will not use or disclose, directly or
indirectly, and will keep strictly secret and confidential all
Confidential Information and Trade Secrets except as required in
the course of Employee's employment by Company." (*Id.*)  Further,
Paragraph 5(c) of the Employee Agreement states that,

> In consideration of Employee's continued employment with
> the company, Employee agrees that during the term of
> employment, and for the two (2) year period immediately
> following termination of employment for any reason,
> Employee will not use Company's Confidential Information or
> Trade Secrets to solicit, accept, divert, or take away, in
> whole or in part, directly or indirectly, any clients or
> "Prospect" (as hereinafter defined) of Company who were
> solicited or serviced by Employee or by anyone directly or
> indirectly under Employee's supervision, or with whom
> Employee had any business relationship, within the two (2)
> year period immediately prior to Employee's termination of

4

employment.  For purposes of this Agreement, "Prospect"
shall be defined as a potential customer known and
contacted by Employee or Company prior to the date of
termination of employment.

(*Id.*)[1]

Mr. Eisenberg voluntarily agreed to these provisions, which

included an acknowledgement in Paragraph 6 of the Employment

Agreement that, "[i]n the event Employee breaches any of its

obligations under Paragraph 5 above the Company will suffer

irreparable injury, not readily susceptible of valuation in

monetary damages." (*Id.*)  Accordingly, Mr. Eisenberg agreed that

DeWitt would be "entitled to injunctive relief against any

breach or prospective breach" by him of the "obligations under

Paragraph 5 above." (*Id.*)

---

[1] The Employment Agreement defines confidential information in paragraph 5(a)
as including:

> All information (whether or not specifically labeled or identified as
> confidential, and whether oral, written, or in any electronic medium)
> relating to Company's trade secrets, knowledge, data, financial
> information, business methods and techniques, technology, processes,
> innovations, concepts, names and lists of accounts, employees,
> customers, clients, vendors, expiration information, name of key
> account contacts, account characteristics, application information, and
> all other information relating to Company that is unique, proprietary,
> or not in the public domain.

(Employment Agreement §5(a).)  Trade Secret, also in Paragraph 5(a), is
defined as "all information that Company reasonably informs Employee (whether
orally or in writing) from time to time is a trade secret, as well as any
other Confidential Information reasonably the subject of trade secret
protection.  Such information is considered secret and is disclosed to
Employee in confidence." (*Id.*)

On April 30, 2013, Mr. Eisenberg contacted DeWitt and requested a meeting on May 1, 2013 at DeWitt's corporate headquarters in New York.  (Memo. at 10.)  Mr. Eisenberg canceled the meeting on May 1, and instead met with the Company's President and Chief Operating Officer (Charles Johnson) on May 6, 2013, where he announced his resignation. (*Id.*)  During this meeting, Mr. Eisenberg has acknowledged that he told DeWitt's President Charles Johnson that he would not abide by the Employment Agreement's non-solicitation provision because he did not believe any non-compete was enforceable against him.  (Eisenberg Aff. ¶ 27.) Mr. Eisenberg has since stated that he left DeWitt because he felt undercompensated due to deductions reducing his income.  (Eisenberg Aff. ¶¶ 25-26.)

Within a day of the announcement of Mr. Eisenberg's departure, DeWitt received a Broker of Record ("BOR") Letter from one of the clients Mr. Eisenberg serviced at DeWitt notifying DeWitt of its move to Gallagher.  (Johnson Decl. ¶ 12.)  DeWitt has since received three more such BOR letters, including one from a client who had only come to DeWitt in March of this year.  (*See* Declaration of John Hamby, ("Hamby Decl."); ¶ 3.)  The record also shows that Mr. Eisenberg, beginning no later than March 18, 2013, began violating his Employment

6

Agreement by sending confidential information from his Company e-mail to his personal e-mail and to Brian Kingman, Managing Director at Gallagher, a direct competitor of DeWitt. (Memo. at 10.) More specifically, Mr. Eisenberg, beginning on April 30, 2013 through May 4, 2013, forwarded e-mails containing confidential information and/or trade secrets to his personal e-mail account, including: (1) an e-mail describing coverage issues for a current DeWitt client; (2) interactive policy renewal applications for a different current DeWitt client; (3) a current DeWitt client's movie script, budget, and other confidential information necessary to solicit preliminary insurance quotes and (4) a current movie client's cast log and medical forms containing confidential coverage and other information. (*See* Biging Decl.; Exhibit B.)[2]  Additionally, DeWitt establishes that Mr. Eisenberg on April 17, 2013 in his

---

[2] The Employment Agreement in Paragraph 5(b) states that,

> Employee shall not retain copies, in any format, of Company Property. Employee agrees and understand that Company property shall not, at any time, be copied or transferred to any memory storage device, online account or person email address that is maintained by or for Employee. Such copying or transferring includes, for example, forwarding emails or an attachment to a personal email account, and exceeds the scope of Employee's authority relating to the use of Company's computer network and electronic communications.

(Employment Agreement at § 5(b).)  Company Property is defined as including, but not being limited to, "all files, papers, memoranda, letters, emails and attachments, instant messages, handbooks and manuals, facsimile or other communications that were written, authorized, signed, received or transmitted during Employee's employment." (*Id.*)

e-mail correspondence with Brian Kingman shared confidential information and/or trade secrets pertaining to a business opportunity to place insurance on behalf of a client with respect to a forthcoming film.  (Plaintiff's Order to Show Cause, Exh. C.)

Immediately upon resigning, Mr. Eisenberg joined Gallagher on May 6, 2013 as Area Executive Vice President, where he is responsible for producing business from his clients and servicing that business. (Eisenberg Aff. ¶ 26.) Mr. Eisenberg's Employment Agreement does not prohibit him from competing with DeWitt in this new role so long as he is not using confidential information obtained during his employment at DeWitt, or attempting to divert clients he serviced while at DeWitt.

**DISCUSSION**

### I. Preliminary Injunction

In order to obtain a preliminary injunction,

a party must demonstrate (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party.

8

*Moore v. Consol. Edison Co. of N.Y., Inc.,* 409 F.3d 506, 510 (2d Cir.2005)(internal quotation marks and citation omitted).

Pursuant to Fed. R. Civ. P. 52(a), in granting or refusing a preliminary injunction, the court shall set forth "the findings of fact and conclusions of law" which constitute the grounds of its action. The Second Circuit has stated that "[t]hese findings are not conclusive, and may be altered after a trial on the merits." *Visual Sciences, Inc. v. Integrated Communications Inc.,* 660 F.2d 56, 58 (citing *Hamilton Watch Co. v. Benrus Watch Co.,* 206 F.2d 738, 740 (2d Cir.1953).

## I. Plaintiff Has Demonstrated Irreparable Harm

Irreparable injury exists where a monetary award does not provide adequate compensation. *See Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir. 1979). Irreparable harm to an employer results through both the loss of client relationships and customer goodwill from a breach of a non-compete clause, and where "an employee has misappropriated trade secrets or confidential customer information, including pricing methods, customer lists and customer preferences." *Johnson Controls, Inc. v. A.P.T. Critical Sys.*, 323 F. Supp. 2d 525, 532-33 (S.D.N.Y. 2004); *see also Ticor Title Ins. Co. v. Cohen*,

9

173 F.3d 63, 69 (2d Cir. 1999) (recognizing that "it would be
very difficult to calculate monetary damages that would
successfully redress the loss of a relationship with a client
that would produce an indeterminate amount of business in years
to come."). For instance, in *Arthur J. Gallagher Serv. Co. v.
Egan*, 2013 U.S. App. LEXIS 5875 (11th Cir. Fla. March. 25,
2013), the court found that "the factors of irreparable harm and
balance of harms weighed in favor of issuing a preliminary
injunction . . . [where if Defendant] continued to solicit his
former clients, the companies stood to lose accounts in which
they had invested significant resources, revenues from the
renewal of those accounts, and goodwill cultivated with those
clients." *See id.* at *11.  The court therefore determined that
"the loss of longstanding clients and goodwill [was] an
irreparable injury."  Here, DeWitt has already received notice
of three clients, previously under Mr. Eisenberg at DeWitt, that
are leaving DeWitt. (*See* Johnson Decl. ¶¶ 10-11.)
Additionally, Mr. Eisenberg has sent confidential Company
property, as defined in the Employment Agreement, from his
DeWitt e-mail address both to a Gallagher employee and his
personal e-mail account.  Mr. Eisenberg does not deny that these
clients have moved to Gallagher or not that he has sent such e-
mails from his work address.  Given the potential future loss of

10

clients and confidential information, DeWitt has shown that they
will suffer irreparable harm if the Employment Agreement is not
enforced.

## II.  Plaintiff Has Demonstrated a Likelihood of Success on the Merits

The likelihood of success on the merits is great where, as
here, the Employment Agreement at issue is enforceable with
respect to both the non-compete and confidentiality provisions.

First, a covenant not to compete will be enforced "to the
extent that it is reasonable in time and area, necessary to
protect an employer's legitimate interests, not harmful to the
general public and not unreasonably burdensome to the employee."
*BDO Seidman v. Hirshberg*, 93 N.Y.2d 382, 289 (N.Y. 1999). "New
York courts addressing . . . twenty-four month restrictions on
solicitation of former clients in the insurance industry have
fond them to be reasonable." *USI Ins. Servs. LLC v. Miner*, 801
F. Supp. 2d 175, 188 (S.D.N.Y. 2011).  Such agreements are not
found overbroad even if they "would prohibit [the employee] from
accepting business from former clients who voluntarily and
without any solicitation chose to continue to do business with
[the employee]." *Id.*

11

Here, the Employment Agreement narrowly tailors the two
year non-compete provision to prohibit Mr. Eisenberg only from
"using the Company's Confidential Information and/or Trade
Secrets . . . to solicit, accept, divert, or take away, in whole
or in part, directly or indirectly," any clients or prospect of
DeWitt "who were solicited or serviced by Employee or by anyone
directly or indirectly under [Mr. Eisenberg's] supervision, or
with whom Employee had any business relationship." (*See* Biging
Decl.)  This does not prevent Mr. Eisenberg from soliciting
clients retained through "pre-existing" relationships or through
his "own independent efforts, unassisted by the firm."
*Barbagallo v. Marcum LLP*, -- F. Supp. 2d --, 2013 WL 132711, at
*18 (E.D.N.Y. Jan. 10, 2013).


Second, New York courts have expressly recognized trade
secrets and other confidential information of the nature DeWitt
specified in the Employment Agreement.  *See, e.g.*, *John Hancock
Mut. Life Ins. Co. v. Austin*, 916 F. Supp. 158, 165 (N.D.N.Y.
1996) (noting that "papers and records in question were not mere
customer lists.  In addition to customer names, these papers
contained information involving customer coverage, premium
amounts, cash values and loans against existing policies," and
that such information "rises to the level of 'confidential

12

customer information.'"); *USI Ins. Servs. LLC v. Miner*, 801 F.
Supp. 2d 175, 189 (S.D.N.Y. 2011)(finding that where employee
sent e-mail from former employer's business e-mail account to
personal e-mail containing names of companies and their
financial information, the document might contain trade secrets
or confidential information).  Here, Mr. Eisenberg agreed not to
"use or disclose, directly or indirectly, and [] keep strictly
secret and confidential all Confidential Information and Trade
Secrets" or retain copies of Company Property during or for two
years after his employment.  Such covenants are reasonable and
enforceable under New York law, and as such Mr. Eisenberg should
be restricted by the provisions he signed.

In any event, the balance of hardships tips in favor of
DeWitt.  Dewitt has established irreparable harm if Mr.
Eisenberg were to breach, or continue to breach, the Employment
Agreement.  In contrast, Mr. Eisenberg can continue earning his
livelihood at Gallagher or elsewhere; he is merely restricted
from using DeWitt's protected information as outlined in the
Employment Agreement to solicit clients.  Indeed, the Employment
Agreement at issue neither prohibits Mr. Eisenberg from
competing with DeWitt nor precludes him from soliciting clients
in the entertainment insurance industry.  Imposing the

13

restrictions Mr. Eisenberg voluntarily agreed to cannot

reasonably be said to disrupt his livelihood or cause him undue

harm. *See Arthur J. Gallagher Serv. Co*, 2013 U.S. App. LEXIS

5875, at *11 (finding that factors weighed in favor of

preliminarily enjoining employee from violating his restrictive

covenant where employee retained the right to compete for new

accounts, but employee's lost ability to solicit clients for two

years with whom the companies had an ongoing relationship).


### III. DeWitt is not Required to Post a Bond

"The language of Rule 65(c) confers broad discretion on the

trial judge to set the amount of the bond, even to dispense with

the bond requirement altogether." *Inflight Newspapers v.*

*Magazines In-Flight, L.L.C.*, 990 F. Supp. 119, 140 (E.D.N.Y.

1997). Mr. Eisenberg has failed to establish that he is likely

to suffer any harm absent the posting of a bond and as such the

bond requirement is unnecessary. *See Doctor's Associates, Inc.*

*v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).


The following order is explicitly modeled by the terms of

the Employment Agreement. Mr. Eisenberg is hereby preliminarily

enjoyed from violating the Employment Agreement, including:


14

1. Disclosing, misusing and/or otherwise misappropriating DeWitt's confidential information and/or trade secrets in violation of Paragraph 5(a) of the Employment Agreement;

2. Violating Paragraph 5(b) of the Employment Agreement requiring Defendant to return any and all Company property (including but not limited to hard copies of documents, e-mails, electronic data and attachments) he may have in his possession;

3. Violating Paragraph 5(c) of the Employment Agreement which prohibits Defendant, for the two (2) year period immediately following termination of employment (to be extended by a period of time equal to the period of time Defendant already spent in violation of Paragraph 5(c)), from using DeWitt's confidential information and/or trade secrets to solicit, accept, divert, or take away, in whole or in part, directly or indirectly, any clients or prospect of DeWitt who were solicited or serviced by Defendant or by anyone directly or indirectly under Defendant's supervision, or with whom Defendant had any business relationship, within the two (2) year period immediately prior to Defendant's termination of employment; and

15

4. Violating Paragraph 5(d) of the Employment Agreement
   prohibiting Defendant, for the two (2) year period
   immediately following termination of employment, from
   directly or indirectly (i) making known to any person,
   business entity, firm or corporation the names or contact
   details of any current employees of DeWitt, or any other
   information pertaining to them, or (ii) attempting to
   recruit of solicit, or aid in the recruitment or
   solicitation of any employees of DeWitt.

It is so ordered.

New York, NY
May      , 2013

_____
                ROBERT W. SWEET
                U.S.D.J.

16