UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------X

DEWITT STERN GROUP, INC.,

                Plaintiffs,

        - against -

RICHARD EISENBERG,

                Defendant.

------------------------------------X

13 Civ. 3060 (RWS)

OPINION

A P P E A R A N C E S:

        Attorney for Plaintiff DeWitt

        GOLDBERG SEGALLA LLP
        780 Third Avenue, Suite 3100
        New York, NY  10017
        By:  Peter J. Biging, Esq.

        Attorney for Defendant Eisenberg

        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
        1745 Broadway, 22nd Floor
        New York, NY  10019
        By:  Aaron Warshaw

**Sweet, D.J.**

Plaintiff DeWitt Stern Group Inc. ("DeWitt" or "Plaintiff") moves for sanctions against Defendant Eisenberg ("Eisenberg" or "Defendant") and Arthur J. Gallagher & Co. ("AJG") (collectively, the "Defendants"), based on Defendant allegedly violating the preliminary injunction issued by this Court on June 4, 2013.  For the reasons set forth below, Plaintiff's motion for sanctions is denied at this time.

**THE PARTIES**

DeWitt is a privately held insurance brokerage and risk management firm, specializing (in part) in insurance for the entertainment industry, with its primary place of business operations and senior management located in New York.  (Memo. Opp. at 4.)

Eisenberg is an established insurance broker.  (Affidavit of Richard Eisenberg ("Eisenberg Aff."); ¶ 2-8.)  From 2007 until May 6, 2013, Eisenberg was employed by DeWitt as a Senior Vice President and producer, with his primary responsibility to sell film insurance products and oversee the handling of client accounts.  (Memo. at 5.)  Eisenberg is currently employed by AJG.  (*Id.*)

1

**PRCOEDURAL HISTORY**

On May 6, 2012, DeWitt filed a Complaint against Eisenberg with an order to show cause for a preliminary injunction prohibiting Eisenberg from violating his Employment Agreement, in particular with respect to the confidentiality and non-solicitation provisions.  On June 4, 2013, this court granted Plaintiff's motion for a preliminary injunction to the extent it prohibits Defendant from future violations of his Employment Agreement (the "June 4 Order").  The preliminary injunction was explicitly modeled on the terms of the Employment Agreement.

On June 18, 2013, Plaintiff filed the First Amended Complaint (the "FAC").  On July 17, 2013, Plaintiff filed an order to show cause for sanctions.  This motion was heard and marked fully submitted on October 2, 2013.

**FACTS**

Prior to Eisenberg's employment at DeWitt, he worked at Aon/AGRIS from 2001 until 2007.  (Eisenberg Aff. ¶¶ 3, 10.) When he joined Aon/AGRIS, he was compensated for the sale of his business, client accounts and goodwill in the amount of $400,000.  (Declaration of Charles Johnson, ("Johnson Decl."); ¶

2

5.)  His employment with Aon/AGRIS therefore contained restrictive covenants preventing him from soliciting these clients for another firm, or competing with them if he were to terminate his agreement.  (*Id.*)

In 2007, Eisenberg left Aon/AGRIS and joined DeWitt, and shortly thereafter Aon/AGRIS filed a Cross-Complaint against DeWitt and Eisenberg alleging, among other things, that Eisenberg had breached the restrictive covenant provisions in his agreement, and that DeWitt had raided and tortuously interfered with its business by convincing customers to abandon their relationships with Aon/AGRIS and move instead to DeWitt. (Biging Decl. ¶¶ 14, 18.)  DeWitt alleges that in order to free Eisenberg from the restraints imposed by his contract with Aon/AGRIS, and to permit Eisenberg to lawfully solicit his former clients for DeWitt, DeWitt entered into a settlement with Aon/AGRIS in which DeWitt paid Aon/AGRIS $425,000.  (Johnson Decl. ¶ 6.)  According to DeWitt, as a result of this settlement, which Eisenberg signed, Eisenberg was permitted to solicit the business he had sold to Aon/AGRIS for DeWitt and continue cultivating these relationships on behalf of DeWitt. (*Id.* at ¶¶ 7-8.)

3

After Eisenberg joined DeWitt, Plaintiff alleges that

Eisenberg, in his capacity as Senior Vice President and

producer, had access to DeWitt's confidential information and

trade secrets, including names and lists of accounts and

clients, names of key account contacts, account characteristics,

pricing information, and application information.  Further,

DeWitt asserts that in the course of his work for DeWitt,

Eisenberg was provided substantial support in his efforts to

make former Aon/AGRIS clients DeWitt clients, thereby building

his book of business, including: (1) substantial compensation on

commissions earned on the business; (2) two full-time employees

to assist him in servicing any business he could bring in; (3)

offices he could work out of on both coasts; and (4)an apartment

in California, half of which was paid for by DeWitt so he could

develop clients on the west coast.  (*Id.* at ¶ 8.)

Eisenberg also signed a series of employment agreements

with DeWitt, including his final agreement executed on or about

October 9, 2012 (the "Employment Agreement").  (Declaration of

Peter S. Biging, ("Biging Decl.").)  The Employment Agreement in

Paragraph 5(a) states that "by signing this Agreement, Employee

acknowledges and agrees that the restrictive covenants contained

in this Agreement are reasonably necessary to protect Company's

4

business interests and that during and after the term of this
Agreement Employee will not use or disclose, directly or
indirectly, and will keep strictly secret and confidential all
Confidential Information and Trade Secrets except as required in
the course of Employee's employment by Company." (*Id.*)  Further,
Paragraph 5(c) of the Employee Agreement states that,

> In consideration of Employee's continued employment with
> the company, Employee agrees that during the term of
> employment, and for the two (2) year period immediately
> following termination of employment for any reason,
> Employee will not use Company's Confidential Information or
> Trade Secrets to solicit, accept, divert, or take away, in
> whole or in part, directly or indirectly, any clients or
> "Prospect" (as hereinafter defined) of Company who were
> solicited or serviced by Employee or by anyone directly or
> indirectly under Employee's supervision, or with whom
> Employee had any business relationship, within the two (2)
> year period immediately prior to Employee's termination of
> employment.  For purposes of this Agreement, "Prospect"
> shall be defined as a potential customer known and
> contacted by Employee or Company prior to the date of
> termination of employment.

(*Id.*)[1]

---

[1] The Employment Agreement defines confidential information in paragraph 5(a)
as including:

> All information (whether or not specifically labeled or identified as
> confidential, and whether oral, written, or in any electronic medium)
> relating to Company's trade secrets, knowledge, data, financial
> information, business methods and techniques, technology, processes,
> innovations, concepts, names and lists of accounts, employees,
> customers, clients, vendors, expiration information, name of key
> account contacts, account characteristics, application information, and
> all other information relating to Company that is unique, proprietary,
> or not in the public domain.

5

Eisenberg voluntarily agreed to these provisions, which included an acknowledgement in Paragraph 6 of the Employment Agreement that, "[i]n the event Employee breaches any of its obligations under Paragraph 5 above the Company will suffer irreparable injury, not readily susceptible of valuation in monetary damages." (*Id.*)  Accordingly, Eisenberg agreed that DeWitt would be "entitled to injunctive relief against any breach or prospective breach" by him of the "obligations under Paragraph 5 above." (*Id.*)

On April 30, 2013, Eisenberg contacted DeWitt and requested a meeting on May 1, 2013 at DeWitt's corporate headquarters in New York.  (Memo. at 10.)  Eisenberg canceled the meeting on May 1, and instead met with the Company's President and Chief Operating Officer (Charles Johnson) on May 6, 2013, where he announced his resignation.  (*Id.*)  During this meeting, Eisenberg has acknowledged that he told DeWitt's President Charles Johnson that he would not abide by the Employment Agreement's non-solicitation provision because he did not believe any non-compete was enforceable against him.  (Eisenberg

---

(Employment Agreement §5(a).)  Trade Secret, also in Paragraph 5(a), is defined as "all information that Company reasonably informs Employee (whether orally or in writing) from time to time is a trade secret, as well as any other Confidential Information reasonably the subject of trade secret protection.  Such information is considered secret and is disclosed to Employee in confidence."  (Id.)

Aff. ¶ 27.) Eisenberg has since stated that he left DeWitt because he felt undercompensated due to deductions reducing his income. (Eisenberg Aff. ¶¶ 25-26.)

Within a day of the announcement of Eisenberg's departure, DeWitt received a Broker of Record ("BOR") Letter from one of the clients Eisenberg serviced at DeWitt notifying DeWitt of its move to Gallagher. (Johnson Decl. ¶ 12.) DeWitt has since received three more such BOR letters, including one from a client who had only come to DeWitt in March of this year. (*See* Declaration of John Hamby, ("Hamby Decl."); ¶ 3.) The record also shows that Eisenberg, beginning no later than March 18, 2013, began violating his Employment Agreement by sending confidential information from his Company e-mail to his personal e-mail and to Brian Kingman, Managing Director at Gallagher, a direct competitor of DeWitt. (Memo. at 10.) More specifically, Eisenberg, beginning on April 30, 2013 through May 4, 2013, forwarded e-mails containing confidential information and/or trade secrets to his personal e-mail account, including: (1) an e-mail describing coverage issues for a current DeWitt client; (2) interactive policy renewal applications for a different current DeWitt client; (3) a current DeWitt client's movie script, budget, and other confidential information necessary to

7

solicit preliminary insurance quotes and (4) a current movie client's cast log and medical forms containing confidential coverage and other information. (*See* Biging Decl.; Exhibit B.)[2] Additionally, DeWitt has established that Eisenberg on April 17, 2013 in his e-mail correspondence with Brian Kingman shared confidential information and/or trade secrets pertaining to a business opportunity to place insurance on behalf of a client with respect to a forthcoming film.  (Plaintiff's Order to Show Cause, Exh. C.)

Immediately upon resigning on May 6, 2013, Eisenberg joined Gallagher as Area Executive Vice President, where he is responsible for producing business from his clients and servicing that business. (Eisenberg Aff. ¶ 26.)  Eisenberg's Employment Agreement does not prohibit him from competing with

---

[2] The Employment Agreement in Paragraph 5(b) states that,

> Employee shall not retain copies, in any format, of Company Property. Employee agrees and understand that Company property shall not, at any time, be copied or transferred to any memory storage device, online account or person email address that is maintained by or for Employee. Such copying or transferring includes, for example, forwarding emails or an attachment to a personal email account, and exceeds the scope of Employee's authority relating to the use of Company's computer network and electronic communications.

(Employment Agreement at § 5(b).)  Company Property is defined as including, but not being limited to, "all files, papers, memoranda, letters, emails and attachments, instant messages, handbooks and manuals, facsimile or other communications that were written, authorized, signed, received or transmitted during Employee's employment." (*Id.*)

DeWitt in this new role so long as he is not using confidential information obtained during his employment at DeWitt, or attempting to divert clients he serviced while at DeWitt.

**APPLICABLE STANDARD OF LAW**

Rule 65(d) states that "[e]very order granting an injunction and every restraining order must: state the reasons why it issued; state its terms specifically; and describe in reasonable detail—and not by referring to the complaint or other document—the act or acts retrained or required." Fed.R.Civ.P. 65(d). As the Supreme Court noted, this rule "reflects Congress' concern with the dangers inherent in the threat of a contempt citation for violation of an order so vague that an enjoined party may unwittingly and unintentionally transcend its bounds." *Int'l Longshoremen's Ass'n, Local 1291 v. Philadelphia Marine Trade Ass'n,* 389 U.S. 64, 76, 88 S.Ct. 201, 19 L.Ed.2d 236 (1967)). Thus, the clarity of the order must be such that it enables the enjoined party "to ascertain from the four corners of the order precisely what acts are forbidden." *Dry Wall Tapers and Pointers of Greater New York, Local 1974 v. Local 530 of Operative Plasterers and Cement Masons Int'l Ass'n,* 889 F.2d 389, 395 (2d Cir. 1989). Ambiguities are usually resolved in favor of the party charged with contempt. *See e.g., N.Y. Tel.*

9

*Co. v. Commc'ns Workers of Am., AFL-CIO,* 445 F.2d 39, 48 (2d
Cir. 1971).

A contempt order is a "potent weapon to which courts should
not resort where there is a fair ground of doubt as to the
wrongfulness of the defendant's conduct." *Tactica Int'l, Inc. v.
Atl. Horizon Int'l, Inc.,* 154 F.Supp.2d 586, 609 (S.D.N.Y. 2001)
(internal citations and quotations omitted). Thus, the
prerequisites for a finding of civil contempt are as follows;
(1) the order which has been violated must be clear and
unambiguous; (2) the violation must be proved by clear and
convincing evidence; and (3) the violating party has not made a
diligent effort to comply with the terms of the order. *See,
e.g., Benham Jewelry Corp. v. Aron Basha Corp.,* No. 97 Civ. 384,
1997 WL 639038 at *1 (S.D.N.Y. Oct. 15, 1997) (citing cases);
*Paramedics Electromedicina Comercial, Ltda. v. GE Med. Sys.
Info. Tech., Inc.,* 369 F.3d 645, 655 (2d Cir. 2004). A finding
of contempt, however, does not require a court to find
willfulness. *Paramedics,* 369 F.3d at 655.

The clear and convincing standard "requires a quantum of
proof adequate to demonstrate a 'reasonable certainty' that a
violation occurred." *Levin v. Tiber Holding Corp.,* 277 P.3d 243,

10

250 (2d Cir.2002); *see also Hart Schaffner & Marx v. Alexander's Dep't Stores, Inc.,* 341 F.2d 101, 102-103 (2d Cir. 1965) (per curiam) ("A civil contempt order will not issue unless there is 'clear and convincing' proof of violation of a court decree; a bare preponderance of the evidence will not suffice."). The moving party must demonstrate that the enjoined party "had knowledge of and disobeyed a clear, explicit and lawful order of the court and that the offending conduct prejudiced the right of the opposing party." *Levin,* 277 F.3d at 251.

**DEFENDANT HAS NOT VIOLATED THE INJUNCTION ORDER AS WRITTEN AND PLAINTIFF'S MOTION FOR SANCTIONS IS THUS DENIED**

The preliminary injunction order clearly and unambiguously enjoined Eisenberg from, among other things,

> Violating Paragraph 5(c) of the Employment Agreement which prohibits Defendant, for the two (2) year period immediately following termination of employment (to be extended by a period of time equal to the period of time Defendant already spent in violation of Paragraph 5(c)), from using DeWitt's confidential information and/or trade secrets to solicit, accept, divert, or take away, in whole or in part, directly or indirectly, any clients or prospect of DeWitt who were solicited or serviced by Defendant or by anyone directly or indirectly under Defendant's supervision, or with whom Defendant had any business relationship, within the two (2) year period immediately prior to Defendant's termination of employment.

*See* June 4 Order, at 15. The order clarified that the Employment Agreement does not prohibit Eisenberg from competing

11

with DeWitt so long as "he is not using confidential information
during his employment at DeWitt, or attempting to divert clients
he serviced while at DeWitt." June 4 Order, at 8. The order
stated that this "does not prevent Eisenberg from soliciting
clients retained through 'pre-existing' relationships or through
his 'own independent efforts, unassisted by the firm.'" June 4
Order at 6 (citing *Barbagallo v. Marcum LLP*, -- F. Supp. 2d --,
2013 WL 132711, at *18 (E.D.N.Y. Jan. 10, 2013)).

Since entry of the order, Plaintiff contends that it has
consistently received broker of record ("BOR") letters
indicating that Eisenberg is continuing to "solicit, accept,
divert, or take away" clients or prospects of DeWitt who were
solicited or serviced by Defendant or by others directly or
indirectly under his supervision while he was employed at
DeWitt. Eisenberg, in turn, does not deny that he has continued
to solicit clients despite this order, but rather asserts that
under his interpretation, the preliminary injunction order does
not prevent or preclude Defendant from engaging in solicitation
of clients so long as his relationships with the clients pre-
dated his employment at DeWitt and were not enabled through
DeWitt's financial and institutional support.

12

The discrepancy in the parties' interpretation of the order turns on whether Eisenberg is capable of having "pre-existing" relationships with any clients he serviced while at DeWitt.

Plaintiff maintains that Defendant himself admits that he had no clients when he joined DeWitt in 2007, having sold all of his business relationships to Aon/AGRIS, which DeWitt subsequently purchased when they hired him for $425,000. (*See* Eisenberg Aff., Exhibit C, ¶ 15 (Eisenberg "retained" none of them).) It was only after DeWitt paid Aon/AGRIS $425,000 in settlement of its claims against both DeWitt and Eisenberg that Defendant obtained a release from his covenant not to compete for these clients and the undisputed right to solicit these clients, this time for DeWitt, in his capacity as a DeWitt employee. (*See* Johnson Decl. ¶ 6; Ex. A; ¶ 3.) Further, Eisenberg's development and servicing of these clients, which DeWitt had purchased, was a result of DeWitt's substantial financial, administrative and logistical support and assistance. Defendant's knowledge, according to Plaintiff, of the clients, client accounts, key client account contacts and so forth therefore constituted "Confidential Information" as defined in the Employment Agreement, and as such Eisenberg is contractually

13

prohibited from soliciting these clients for a period of two
years.

Plaintiff has further alleged that AJG should equally be
held accountable for Defendant's conduct, in so far as AJG
provided and continues to provide resources and assistance which
enable Eisenberg to solicit and service the clients at issue.
AJG has been and should be aware of the Employment Agreement's
non-solicitation provisions, and should be held responsible for
assisting the enjoined Defendant. *See Levin v. Tiber Holding
Corp.*, 277 F.3d 243, 250 (2d Cir. 2002) (a party that is not
bound by a court order may be found guilty of civil contempt if
(1) the party bound by the order committed contempt; and (2) the
party not bound by the order assisted the enjoined party).

Defendant, in contrast, has contended that he has not used
any of DeWitt's confidential information or trade secrets to
solicit any accounts or clients, and has only solicited clients
with whom he had pre-existing relationships.  DeWitt's BOR
letters confirm this, as all of the clients Defendant has
approached are those with whom Eisenberg has had a long standing
relationship pre-dating DeWitt.   For instance, Pressman
Corporation, which recently switched to AJG, is run by Mr.

14

Pressman with whom Eisenberg has worked for over 23 years.
Similarly, Eisenberg has worked with the Weinstein Company since
the 1980s and with the DeLaurentis family since the 1970s.
Defendant has also known Mr. MacKinney, the principal decision
maker for Mosaic's insurance, for other twenty years.  Eisenberg
has established that his recruitment of these clients, and their
subsequent move to AJG, is the result of Defendant's "pre-
existing" personal relationships and reputation as an insurance
broker, and not because he used any confidential information or
trade secrets belonging to DeWitt.  (Eisenberg First Aff., ¶
31.)

The BOR letters show that Eisenberg has solicited clients
with whom he had relationships pre-dating DeWitt.   The "use of
information about an employer's customers which is based on
casual memory . . . is not actionable." *Buhler v. Michael P.
Maloney Consulting, Inc.*, 299 A.D.2d 190, 191 (1st Dep't 2002)
("A contact list prepared by plaintiff based on her knowledge of
the financial services industry and on information that was
publicly available does not qualify as a trade secret and is not
entitled to protection."); *H. Meer Dental Supply Co. v. Comm'n*,
269 A.D.2d 662, 664 (3d Dep't 2000) ("[I]n order to establish
confidential customer information status, it is incumbent upon

15

plaintiff to demonstrate that its customers are not known in the trade and are discoverable only by extraordinary efforts. Plaintiff has failed to prove that such information is not readily discoverable through public sources."); *TBA Global, LLC v. Proscenium Events, LLC*, No. 651171-12, 2013 WL 1455933, at *1 (N.Y. Sup. Ct. Apr. 1 2013) (clients in the film insurance industry are "large well-known companies readily ascertainable as potential business opportunities" and knowledge of their identities simply cannot be considered confidential).

As a matter of law, Eisenberg's own recollection of his customers or pre-existing relationships cannot constitute confidential information. *See Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 510 (S.D.N.Y. 2011) ("[F]ormer employees can use their recollection of information about customers and such recollected information is not considered confidential for purposes of enforcing restrictive employment covenants."); *Buhler*, 299 A.D.2d at 191 ("It is well-settled that an employee's recollection of information pertaining to the needs and habits of particular customers is not actionable."). Nothing about the names or identities of accounts or clients, nor the contacts at those accounts, is confidential or a trade secret belonging to DeWitt.

16

Had DeWitt meant to prohibit Eisenberg from soliciting *any* clients he serviced while at DeWitt, it should have specified as such in the Employment Agreement.  Defendant has not violated the order or Agreement merely by approaching clients whose names and identities he knew prior to joining DeWitt, and which are readily accessible to the public.  (*Id.* ¶ 29.); *see also Arnold K. Davis & Co., Inc. v. Ludemann*, 160 A.D.2d 614, 615 (1st Dep't 1990) ("[A]n insurance company's customer list is generally not considered to be a trade secret.").

With respect to Plaintiff's argument that Defendant could not have had any pre-existing relationships with clients when he joined DeWitt because DeWitt purchased the relationships with these clients and Eisenberg's "book of business" in the settlement with Aon/AGRIS in 2007, though that DeWitt released Defendant from his non-compete clause, neither the Settlement Agreement nor the Employment Agreement state or even refer to an explicit agreement whereby DeWitt would exclusively own Eisenberg's clients.  The Settlement Agreement instead states that DeWitt purchased a "compromise" amongst the parties that "will never be construed as an admission by any of the Parties of any liability, wrongdoing or responsibility." (*See* Settlement Agreement, ¶ 2.)  The Employment Agreement does not make any

17

reference to DeWitt owning Eisenberg's "book of business" or his
clients.  While later discovery may evidence a more explicit
intention in the Settlement Agreement to establish that DeWitt
does own Eisenberg's clients, no such evidence has yet been
adduced.  Further, though it has been established, as set forth
above, that Eisenberg transferred the Plaintiffs' confidential
data to his personal computer, it has not been established that
this data was used to approach the former DeWitt clients, nor
has any monetary value been established for the data.
Accordingly, Eisenberg is restricted solely by the terms of the
Employment Agreement, which does not prevent solicitation
through non-confidential information or trade secrets of clients
with whom he had a pre-existing relationship. *See, e.g.*,
*Barbagallo*, No. 11-CV-1358, 2013 WL 132711, at *19 (dismissing
breach of restrictive covenant claim because former employee had
"pre-existing relationships" with all the clients at issue;
"sensible clients follow the talent they trust, and not the
organizations to which that talent is temporarily attached.
Clients are not dragged against their will from one firm to
another, but actively choose who they will retain for
professional services.") (collecting cases); *Nebraskaland, Inc.
v. Brody*, No. 09-CV-9155 (DAB), 2010 WL 157496, at *3 (S.D.N.Y.
Jan. 13, 2010) ("*BDO Seimand* prevents the Court from enforcing

18

the restrictive covenant" to retrain solicitation of customers with whom defendant had a "pre-existing relationships"); *Good Energy, L.P. v. Kosachuk*, 49 A.D. 3d 331, 332 (1st Dep't 2008) (non-compete clause unenforceable because it prohibited former employee from working with clients who followed him due to his "pre-existing relationship" with them).

Plaintiff is correct that Defendant is prohibited from soliciting clients with which he had developed "personal relationships" based upon the financial support of his employer, including a salary, support staff, and expenses. *Marsh USA Inc. v. Karasaki*, 2008 U.S. Dist. LEXIS 90986, *51-52 (S.D.N.Y. Oct. 30, 2008); *see also Silipos, Inc. v. Bickel*, 2006 U.S. Dist. LEXIS 54946, *17-18 (S.D.N.Y. Aug. 8, 2006) (finding protection of plaintiff's employer's client base to be legitimate interest where plaintiff employer "shouldered all of the monetary expenses" of the former employee's significant sales activities with clients). Plaintiff, though, has not adduced any evidence that the clients Eisenberg has solicited were acquired through his performance of services for the firm's clientele during the course of his employment, and not through his own pre-existing relationship. *See FTI Consulting, Inc v. Graves*, 2007 U.S. Dist. LEXIS 55325, at *27 (S.D.N.Y. July 30, 2007) ("Under New

19

York law, FTI may establish a legitimate interest so as to restrict [former employee's] use of client relationships if it can show that FTI enabled [former employee] to acquire relationships with the clients through his performance of services for the firm's clientele during the course of his employment.").  Because Plaintiff has failed to show evidence of any solicitation of clients Defendant did not have a pre-existing relationship with prior to DeWitt's assistance, Plaintiff has shown that Defendant has violated the terms of his Employment Agreement and the court's June 4 Order by obtaining DeWitt's confidential data but not for his solicitations.

However, after the order Eisenberg discovered that his personal email account still contained emails he sent and received in furtherance of his work at DeWitt, and he immediately worked with counsel to delete these emails or return them to DeWitt as required by the order.  (*Id.* ¶ 44.)  The violation of the June 4 Order and the Employment Agreement with respect to the confidential data has thus been effectively resolved.

20

**CONCLUSION**

For the reasons set forth above, Plaintiff's motion for sanctions against Eisenberg is denied.

It is so ordered.

New York, NY
October 29, 2013

ROBERT W. SWEET
U.S.D.J.