UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 6-26-17

-----------------------------------X

DEWITT STERN GROUP, INC.,

                    Plaintiff,                13 Civ. 3060

    -against-                       OPINION

RICHARD EISENBERG and ARTHUR J.
GALLAGHER RISK MANAGEMENT
SERVICES, INC.,

                    Defendants.

-----------------------------------X

A P P E A R A N C E S:


        Attorneys for Plaintiff

        GOLDBERG SEGALLA LLP
        600 Lexington Avenue, Suite 900
        New York, NY 10022
        By:  Peter J. Biging, Esq.
             Joanne J. Rombero, Esq.
             Jill Owens, Esq.
             Mike Katzen, Esq.


        Attorneys for Defendants

        OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.
        1745 Broadway, 22nd Floor
        New York, NY 10017
        By:  Carmen J. DiMaria, Esq.
             Aaron Warshaw, Esq.

**Sweet, D.J.**

Defendants Richard Eisenberg ("Eisenberg") and Arthur J. Gallagher Risk Management Services, Inc. ("AJG") (collectively, "Defendants"), have moved pursuant to Fed. R. Civ. P. 56 for summary judgment to dismiss the claims of Plaintiff DeWitt Stern Group, Inc. ("DeWitt" or the "Plaintiff") as set forth in the Second Amended Complaint ("SAC"). DeWitt has moved pursuant to Fed. R. Civ. P. 56 for summary judgment on the same, as well as summary judgment dismissing Eisenberg's counterclaims. Defendants have also moved to exclude the testimony and report of Plaintiff's expert Pamela M. O'Neill (the "O'Neill Testimony and Report").

Based upon the facts and conclusions set forth below, Defendants' motion for summary judgment dismissing the SAC is granted, Plaintiff's motion for summary judgment granting the SAC is denied, Plaintiff's motion for summary judgment dismissing Eisenberg's counterclaims is granted, and Defendants' motion to exclude the O'Neill Testimony and Report is dismissed as moot.

**Prior Proceedings**

On May 6, 2013, DeWitt initiated the present action based upon the employment agreements between the parties relative to the brokerage of insurance for entertainment producers. (Dkt. 1.) A preliminary injunction barring violation by Eisenberg of his employment agreement was entered June 4, 2013. (Dkt. 12.)

On June 18, 2013, DeWitt filed his First Amended Complaint ("FAC"), which added AJG as a defendant. (Dkt. 15.) The FAC contained the following causes of action: claim for declaratory relief (Count I); breach of contract against Eisenberg (Count II); misappropriation of confidential information and/or trade secrets against Eisenberg and AJG (Count III); breach of fiduciary duty against Eisenberg (Count IV); breach of duty of loyalty against Eisenberg (Count V); preliminary and permanent injunctive relief against Eisenberg (Count VI); tortious interference with contractual relations against AJG (Count VII); aiding and abetting breach of duties against AJG (Count VIII); unfair competition against Eisenberg and AJG (Count IX); and intentional interference with business relations against Eisenberg and AJG (Count X). (Id.) On July 12, 2013, Defendants timely filed their answer to the FAC, in which Eisenberg filed counterclaims against DeWitt asserting breach of employment

agreement, unjust enrichment/restitution, and failure to pay
wages under the New York Labor law. (Dkt. 18.)

On July 17, 2013, DeWitt filed an application for
sanctions, claiming that Eisenberg and AJG had violated the
terms of the Court's June 4, 2013 order by Eisenberg's continued
solicitation of customers with whom he had pre-existing
relationships prior to joining DeWitt. (Dkt. 22.) On October 29,
2013, DeWitt's application for sanctions was denied. (Dkt. 39.)

On April 9, 2014, Plaintiff's motion to amend the FAC was
granted in part and denied in part. (Dkt. 57.) On April 16,
2014, DeWitt filed the SAC containing the same claims as the FAC
but adding its claim for unjust enrichment against Eisenberg
(Count XI). (Dkt. 60.) Defendants timely filed their answer to
the SAC on April 30, 2014. (Dkt. 61.) DeWitt filed its answer to
Eisenberg's counterclaims on May 12, 2014. (Dkt. 62.) The
parties completed discovery in May 2016.

On August 5, 2016, Defendants moved for summary judgment on
the SAC, (Dkt. 106), and to exclude the O'Neill Testimony and
Report, (Dkt. 110). On the same day, Plaintiff moved for summary
judgment on the SAC, (Dkt. 112), and on Eisenberg's

counterclaims, (Dkt. 116). The instant motions were heard and marked fully submitted on December 15, 2016.

**The Facts**

## 1. The Facts as Relevant to Defendants' Motion for Summary Judgment

With respect to Defendants' motion for summary judgments, the following facts are set forth in Defendants' Statement of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Defs.' 56.1"),(Dkt. 108), Plaintiff's Counterstatement of Facts Pursuant to Local Rule 56.1 ("Pl.'s Counter 56.1"), (Dkt. 147), and accompanying declarations and exhibits, which together form the basis of the following factual recitation. The facts are not in dispute except as otherwise noted.

1. The nature of the entertainment insurance industry is disputed. Defendants describe it as small compared to the general insurance industry and one driven almost entirely by personal relationships, a field where relationships are the primary source of repeat business. (Declarations of Peter J. Biging dated October 5, 2016 ("Biging Decl."), Dkts. 125 and 126, Exs. 11 and GG, and Declarations of Aaron Warshaw dated August 5, 2016 and October 7, 2016 ("Warshaw Decl."), Dkts. 109

4

and 140, Ex. C (together, "Hamby Dep."), at 48:14-50:2.) By contrast, DeWitt contends that while "there are a lot of firms" in the entertainment industry, it is only in terms of "the number of insurance brokerage agencies that write entertainment insurance" that the industry is small when compared to the general insurance industry. (Hamby Dep. at 49:21-25.)

2. In the entertainment insurance business, clients include film and television production companies, advertising agencies, event production companies, event venues, and theaters. (Hamby Dep. at 22:9-14.) These clients may move between projects and companies, but the clients can continue to work with the same insurance brokers. (Hamby Dep. at 50:3-12.) Plaintiff augments this description by noting that not all client do continue to work with the same insurance brokers, and that industry clients tend to switch brokers around fifty-percent of the time. (Hamby Dep. at 50:3-12.)

3. The identities of the decision-makers who make purchases in the entertainment insurance industry are generally known throughout the industry. (See Hamby Dep. at 56:19-57:2.)

4. Numerous industry resources (*e.g.*, Deadline.com, Variety, and IMDb Pro) exist that contain key information

regarding new films that are about to go into production, as well as regarding key comings and goings in the entertainment industry. (Hamby Dep. at 79:2-81:11.) These resources are available to everyone. (Id.) Plaintiff notes, however, that such resources do not necessarily contain every movie, contact information, movie scripts, cast logs, or other kinds of information.

5.    Defendants state that types of insurance coverages placed for clients in the entertainment insurance industry are not a secret, and any competent broker in the industry would know what the coverages consist of. (Hamby Dep. at 55:12-22.) Plaintiff contends that while those in the insurance industry may generally know what types may be available, they do not know the specific details, and that not every insurance broker knows the particular client's preferences, risk tolerances, desires and concerns of key account contacts, insurance programs in place, and other such detail.

6.    A broker can request policy information, including expiration information and account characteristics, directly from a client, even if that broker is not the broker of record ("BOR"), and the client is free to provide that information to a competing broker because the information belongs to the client.

6

(Warshaw Decl., Ex. B, and Biging Decl., Ex. Y (together, "Johnson Dep."), at 121:12-18, 121:25-124:16, 128:22-130:8.)

7.    Insurance brokers in the entertainment industry can contact prospective clients and ask them their current broker's rates and the terms of their current policies, and the prospective client sometimes provide brokers with such information. (Hamby Dep. at 54:17-24, 57:1017; Warshaw Decls., Exs. E and GG, and Biging Decls., Exs. 12 and HH (together, "Born Dep."), at 65:18-66:24.) The parties disagree to the degree of frequency of such outreach and the degree of willingness of clients to share such information.

8.    Eisenberg is 78 years old and, for majority of the past 50 years, has been an insurance broker in the entertainment industry.

9.    Eisenberg first began developing a book of business after starting his own insurance agency in the 1970s called Great Northern Brokerage Corp. ("Great Northern" or "GNBC"). (Warshaw Decl., Ex. A, and Biging Decls, Ex. 4-7, 15, 16, DD, KK, and YY (together, "Eisenberg Dep.") at 19:14-21; Johnson Dep. at 26:21-27:2; Warshaw Decls., Exs. D and FF, and Biging Decls., Exs. 7 and J (together, "Paige Dep.") at 26:3-8.)

Eisenberg's book of business developed over the course of his career based in part on his personal relationships and time in the industry. (Eisenberg Dep. at 113:19-115:15, 197:12-22; Johnson Dep. at 37:22-38:9.)

10.   In 2001, Eisenberg sold Great Northern's assets to Aon/Albert G. Reuben Insurance Services, Inc. ("Aon/AGRIS"), where Eisenberg proceeded to work as a consultant. (Eisenberg Dep. at 19:7-9, 21:423:20, 26:10-21; Johnson Dep. at 27:3-19.) Included in Aon/AGRIS' purchase was the purchase of Eisenberg's book of business. (Johnson Dep. at 63:11-20.)

11.   In October 2007, DeWitt recruited and hired Eisenberg as a Senior Vice President. (Warshaw Decl., Ex. R; Paige Dep. at 51:18-52:19; Johnson Dep. at 38:10-19.) Eisenberg was to be responsible for creating relationships and producing insurance accounts on behalf of DeWitt. (Id.)

12.   DeWitt was interested in hiring Eisenberg because Eisenberg was an influential person and had great contacts in the industry. (Paige Dep. at 23:11-19.) Plaintiff also claims that it entered into contract with Eisenberg to purchase his book of business.

13. At the time of hiring Eisenberg, DeWitt was aware of
confidentiality and non-solicitation restrictive covenants
between Eisenberg and Aon/AGRIS, (see Paige Dep. at 39:14-17),
as well as that Eisenberg had sold his book of business to
Aon/AGRIS, (see Johnson Dep. at 63:11-20).

14. Part of DeWitt's motivation to hire Eisenberg was that
Eisenberg would seek out and service the same clients for DeWitt
that he had done while employed at Aon/AGRIS. (See Born Dep. at
56:15-23; Paige Dep. at 28:23-29:24; Johnson Dep. at 35:9-14),
which Eisenberg did, (see Eisenberg Dep. at 51:4-11).

15. Upon hiring Eisenberg, DeWitt issued a press release
that stated, in part, that "[Eisenberg's] extraordinary
experience and deep relationships in the entertainment community
will enhance our goal of continuing to strengthen DeWitt Stern's
rapidly growing film and media division." (Warshaw Decl.,
Ex. P.)

On October 9, 2007, Eisenberg signed an agreement setting
forth the terms of his employment with DeWitt (the "2007
Employment Agreement"). (See Warshaw Decl., Ex. R.) The 2007
Employment Agreement contained a five-year term, and set forth
Eisenberg's compensation as a Senior Vice President: 30% net

commission on amounts received from accounts he produced, expense reimbursement, and "Bonus Compensation" of $90,000 to be paid over his first three months at DeWitt. (Id.) Plaintiff disagrees that the 2007 Employment Agreement was only a contract for employment; rather, Plaintiff contends the 2007 Employment Agreement was also a contract to purchase Eisenberg's "present and future" book of business.

16. Between 2007 and 2009, DeWitt, Eisenberg, and Aon/AGRIS engaged in litigation arising out of Eisenberg's departure from Aon/AGRIS to DeWitt. (Eisenberg Dep. at 100:16-19.)

The parties frame the dispute with Aon/AGRIS differently. Defendants claim that Aon/AGRIS alleged, among other things, that DeWitt raided and tortiously interfered with its business by convincing customers to abandon their relationships with Aon/AGRIS and move Eisenberg's business to DeWitt. (See Warshaw Decl., Ex. P at Exs. B-E.) By contrast, Plaintiff states that Aon/AGRIS argued, among other things, that Eisenberg breached the non-competition provisions of the consulting agreement he had entered into with Aon/AGRIS, and that DeWitt should be liable to Aon/AGRIS for the loss of profits resulting from this based on their conduct in soliciting him to work for DeWitt and

for hiring Christina Born ("Born") and Jennifer Bond ("Bond"), account representatives who were to assist Eisenberg.

17. In the Aon/AGRIS case, Defendants claim that DeWitt argued that Aon/AGRIS could not show any damages as a result of Aon/AGRIS's loss of Eisenberg's book of business. (Warshaw Decl., Ex. P at Exs. B-E.) DeWitt rejects this characterization of their legal position at the time.

18. The litigation between DeWitt, Eisenberg, and Aon/AGRIS was ultimately settled, at which point the parties entered into a Settlement and Release Agreement (the "Settlement Agreement"). (See Warshaw Decl., Ex. I.) As part of the Settlement Agreement, DeWitt paid Aon/AGRIS $425,000, by which it purchased "a compromise" amongst the parties that "will never be construed as an admission by any of the Parties of any liability, wrongdoing or responsibility." (Warshaw Decl., Ex. I at ¶ 2; Johnson Dep. at 70:5-11.) Plaintiff adds that its decision was based upon a belief that there was a significant chance it would lose on the merits.

19. Under the Settlement Agreement, the parties "expressly den[ied] any such liability, wrongdoing or responsibility." (Warshaw Decl., Ex. I, ¶ 2.)

20. In the case against Aon/AGRIS, Eisenberg and DeWitt shared the same counsel and litigation strategy. (Eisenberg Dep. at 100:20-23, 101:13-102:9, 209:6-10.) The parties' impressions of their involvement in the Aon/AGRIS lawsuit differ, however.

Eisenberg states he was generally not involved in the litigation; he claims he did not know why the lawsuit was commenced in his name or the lawsuit's results, other than it ended in settlement. (Eisenberg Dep. at 102:10-15, 103:16-25, 111:3-22.) Eisenberg further claims that the decision as to which counsel to select, the litigation strategy, the choice to settle, and the ultimate value of the settlement were each made solely by DeWitt. (Johnson Dep. at 71:3-72:3; Eisenberg Dep. at 100:20-23, 101:13-102:9, 209:6-10, 211:2-8.) Eisenberg states he was never made aware that DeWitt believed it had settled the lawsuit to purchase his book of business from Aon/AGRIS. (Warshaw Decl., Ex. Q, ¶ 34.)

DeWitt states that Eisenberg was aware that the lawsuit and settlement with Aon/AGRIS was intended to allow Eisenberg to solicit customers and clients he had serviced at Aon/AGRIS which formed the book of business he had agreed to sell to DeWitt. (Johnson Dep. at 64, 72-73.)

21. Eisenberg's employment under the 2007 Employment Agreement expired in October 2012 at the conclusion of the contract's five year term. (Warshaw Decl. Ex. R.) On October 9, 2012, DeWitt and Eisenberg entered into a new employment agreement (the "2012 Employment Agreement"). (Warshaw Decl., Ex. T; see Eisenberg Dep. at 55:3-21.)

22. The 2012 Employment Agreement was for a two year term, and provided that Eisenberg would be paid an annual draw of $195,000 against net commissions generated by Eisenberg on his accounts, plus 30% of any commissions generated over $195,000. (See Warshaw Decl., Ex. T.) Under the 2012 Employment Agreement, Eisenberg's duties and responsibilities remained the same, and he continued to service the same accounts. (See Eisenberg Dep. at 55:22-56:5.)

23. The 2012 Employment Agreement contained an "Entire Agreement Interpretation" clause, that stated: "This Agreement . . . constitute[s] the entire understanding of the Parties with respect to the subject matter hereof, and supersede[s] all prior and contemporaneous agreements, understandings, promises and representations relating to the subject matter hereof, written or otherwise." (Warshaw Decl., Ex. T, ¶ 13.) Plaintiff disputes

13

that this clause undid the sale of Eisenberg's book of business to DeWitt back in 2007.

24.     Under the 2012 Employment Agreement, Eisenberg agreed that he would not use or disclose any of DeWitt's confidential information or trade secrets. (Warshaw Decl., Ex. T, ¶ 5a.) Eisenberg further agreed in the 2012 Employment Agreement that, during the term of his employment and for a period of two years thereafter, he would not use DeWitt's confidential information or trade secrets to solicit, accept, divert, or take away any of DeWitt's clients or prospects that were solicited or serviced by Eisenberg within the prior two years. (Warshaw Decl., Ex. T, ¶ 5c.) The 2012 Employment Agreement does not reference Eisenberg's "book of business," Eisenberg's clients, or Eisenberg's accounts. (See Warshaw Decl., Ex. T.)

25.     According to the Defendants, the 2012 Employment Agreement also does not include provisions prohibiting Eisenberg from soliciting or doing business with any client he serviced at DeWitt so long as he did not use DeWitt's confidential information or trade secrets to do so.[1] (See Warshaw Decl., Ex.

---

[1] In the 2012 Employment Agreement, "Confidential Information" is defined as:

14

T.) Plaintiff adds that the prohibition against use of confidential information was to be for a period of two years, and included prohibiting information concerning "account characteristics," which reasonably include the insurance preferences, desires and concerns of the key account contacts, such as which insurers they prefer placing insurance with, the amount of uninsured risk they are willing to take on in order to save on premium costs, preferred options or coverage, limits and rating schedules, and other particularized needs, information regarding blanket, long term, renewable insurance programs studios may have in place in addition to the non-recurring insurance typically purchased for specific film and television productions. (See Pl.'s Counter 56.1 ¶ 21.)

> [A]ll information (whether or not specifically labeled or identified as confidential, and whether oral, written, or in any electronic medium) relating to Company's trade secrets, knowledge, data, financial information, business methods and techniques, technology, processes, innovations, concepts, names and lists of accounts, employees, customers, clients, vendors, expiration information, names of key account contacts, account characteristics, application information, and all other information relating to Company that is unique, proprietary, or not in the public domain. Trade Secrets is defined as all information that Company reasonably informs Employee (whether orally or in writing) from time to time is a trade secret, as well as any other Confidential Information reasonably the subject of trade secret protection. Such information is considered secret and is disclosed to Employee in confidence.

(Warshaw Decl., Ex. T, ¶ 5(a).)

15

26. Towards the end of the 2007 Employment Agreement, Eisenberg claims he first learned that DeWitt had a commission arrangement with Fireman's Fund Insurance Company ("Fireman's Fund") under which only DeWitt would receive income at the end of certain insurance contracts. (Eisenberg Dep. at 122:7-22, 124:15-125:8, 127:3-15, 204:21-206:12, 212:10-213:17, 216:2-18.) Eisenberg states he viewed this as preventing him from obtaining a higher commission rate from Fireman's Fund. (Id.) Eisenberg called DeWitt's President and Chief Operating Officer Charles Johnson ("Johnson") to complain about the deductions from his commissions, which Eisenberg says were acknowledged by DeWitt but not altered. (Eisenberg Dep. at 123:5-8, 126:5-12, 127:17-18, 215:1-18.)

Plaintiff disputes that this was its arrangement with Fireman's Fund or when Eisenberg was made aware of it. According to Plaintiff, to the extent it had back-end "profit sharing" commissions with Fireman's Fund, they were generally at the end of the year, not specific to individual insurance contracts, usually based on the overall production by DeWitt, and not based on specific accounts or a specific producer's accounts. (See Declaration of Kevin Walker dated August 5, 2016 ("Walker Decl."), ¶ 3, Dkt. 119.) Plaintiff further contends that these

16

back-end commissions did not result in deductions from
Eisenberg's commissions, reduce Eisenberg's income, and were
laid out in the 2007 Employment Agreement.

27.     On May 6, 2013, Eisenberg announced he would resign
from DeWitt. (Johnson Dep. at 94:2-19; Warshaw Decl., Ex. K.)
Eisenberg claims this was because he believed the DeWitt and
Fireman's Fund commission arrangement hurt his commission rate.
(Eisenberg Dep. at 127:22-128:2).

28.     During Eisenberg and Johnson's phone conversation,
Eisenberg told Johnson that Eisenberg was leaving for AJG
because AJG was offering more money. (See Johnson Dep. at 106:4-
107:5; Warshaw Decl., Ex. J.) Johnson asked Eisenberg whether
Eisenberg would honor the two-year non-solicitation provision in
the 2012 Employment Agreement, to which Eisenberg replied that
he did not intend to because Eisenberg believed he still owed
his accounts, which he stated he had not sold to DeWitt, and
therefore could not be precluded from doing business with his
long-standing relationships. (See Warshaw Decl., Ex. I, J, K.)

29.     During the phone call, Johnson did not discuss with
Eisenberg that DeWitt bought Eisenberg's book of business.
(Johnson Dep. at 104:15-105:12.) Johnson also did not tell

17

Eisenberg that Eisenberg had no business to sell because he already sold it to Aon/AGRIS. (Johnson Dep. at 105:13-22.) Johnson told Eisenberg that DeWitt was going to sue him. (Warshaw Decl., Ex. K.)

30. On May 6, 2013, Eisenberg joined AJG as Area Executive Vice President. (Eisenberg Dep. at 4:23-5:6.)

31. At the time of Eisenberg's move to AJG, the Weinstein Company ("Weinstein") had been a long-standing client of Eisenberg's. (Biging Decl., Ex. B ("Born Dep.") at 104:6-12.) Defendants state that Eisenberg would have known all the key persons of long-standing clients, (Johnson Dep. at 144:17-145:5); Plaintiff disagrees, (Johnson Dep. Tr. at 145:5-7). The parties do not dispute that before and after signing his employment agreements with DeWitt, Eisenberg knew contacts at long-standing accounts and did business with them. (Warshaw Decl., Ex. P at ¶ 29.)

32. Defendants argue that the names of the key account representatives at Weinstein is not confidential information. (Born Dep. at 104:6-12.) Plaintiff disagrees and believes that such information falls under the 2012 Employment Agreement's definition of confidential information.

33. After Eisenberg left DeWitt for AJG, a representative for client Edward R. Pressman Film Corporation ("Pressman Corporation") sent an email to DeWitt asking for a list of all of Pressman Corporation's current coverages, which the Pressman Corporation representative then provided to Eisenberg at AJG. (Born Dep. at 76:17-78:15; Warshaw Decl., Ex. O.) Plaintiff notes that Eisenberg had solicited Pressman Corporation for business following his departure from DeWitt. (Warshaw Decl., Ex. Q.) The parties disagree about the factors that lead clients such as Pressman Corporation to switch from DeWitt to AJG.

34. John Hamby ("Hamby"), the head of DeWitt's headquarters in Glendale, California, stated he was concerned upon learning Eisenberg was leaving DeWitt because he "knew Richard had relationships with his key clients and knew that they could very likely follow him." (Hamby Dep. at 16:15-18, 68:11-16.)

35. Hamby has stated that clients moved from DeWitt to AJG, at least in part, because of a relationship with Eisenberg that predated Eisenberg's employment at DeWitt:

Q: Is it fair to say that the five you listed – Weinstein, New Regency, Ed Pressman, Mosaic and DeLaurentis – all left because of a relationship that Eisenberg had with the people there?

A: Yes.

Q: . . . Do you know if the relationship that Eisenberg had with the decision makers from those five clients existed before Mr. Eisenberg joined DeWitt?

* * *

A: I would say very likely yes.

(Hamby Dep. at 74:1-15.)

36.    Eisenberg and Tim Clawson ("Clawson"), an executive at New Regency Production ("New Regency"), worked together for many years and possessed a strong working relationship. (See Hamby Dep. at 82:13-20.)

37.    Clawson's promotion to Head of Production at New Regency was neither secret nor confidential. (See Hamby Dep. at 79:23-25.)

38.    When Clawson became Head of Production for New Regency, he wanted Eisenberg, who was then still at DeWitt, to be his broker due to his personal relationship with Eisenberg:

"We are changing brokers immediately. We appreciate your service to New Regency. This is not personal but a business

decision. As you know I have 25 years of working experience with Richard Eisenberg and I have relied on him over the years as part of what I bring to an organization. As you know there is a difference between working with good people and working with good people you have worked with before."

(Warshaw Decl., Ex. M.) Plaintiff contests that Clawson's personal relationship with Eisenberg was the sole reason Clawson sought to work with DeWitt at that point.

39.    Defendants claim that Born has stated that the sole reason that New Regency, at that point employing DeWitt, moved its business from DeWitt to AJG was because of Eisenberg's relationship with Clawson:

Q: When Richard was at DeWitt, New Regency became a client of DeWitt; is that correct?

A: Correct.

Q: And is that because of Richard's relationship with Tim Clawson?

A: Correct.

Q: And then once Richard left and went to Gallagher, the business moved from DeWitt to Gallagher; is that correct?

A: Correct.

Q: And again, that's because of Richard's relationship with Clawson, correct?

A: Correct.

Q: Any other reason they moved?

A: No.

(Born Dep. at 84:3-17.) Defendants claim New Regency's relationship with Eisenberg was the sole reason for its switch to AJG, which Plaintiff contests, claiming rather it was based on improper solicitation.

40.     Around this time, Born spoke with Clawson to try to keep New Regency as a client of DeWitt; during that conversation Clawson told Bonn, "I've been with Richard for 35 years, and it's about the relationship." (Born Dep. at 114:20-115:14.).

41.     The only thing that Eisenberg used to solicit New Regency's business was Eisenberg's relationship with Clawson at New Regency. (See Hamby Dep. at 86:1-10.)

42.     Along with New Regency, other clients switched from DeWitt to AJG because of Eisenberg, although the parties disagree how many clients that this was or the degree those decisions was based on those clients' relationship with Eisenberg. (See Born Dep. at 59:24-60:5; Pl.'s Counter 56.1 ¶ 48.)

43. On June 3 and 4, 2013, Pressman Corporation replaced DeWitt with AJG as its BOR. (Defs.' 56.1 ¶ 54; Pl.'s Counter 56.1 ¶ 54; Warshaw Decl., Ex. V.)

44. On June 18 and July 2, 2013, Twisted Pair Developments, LLC ("Twisted Pair") issued two BOR letters replacing DeWitt with AJG as its BOR replacing DeWitt with AJG as its BOR. (Defs.' 56.1 ¶ 55; Pl.'s Counter 56.1 ¶ 55; Warshaw Decl., Ex. W.)

45. Defendants state that Twisted Pair is connected to Pressman Corporation. (Eisenberg Dep. at 157:23-158:9.) Plaintiff disputes this. (See Pl.'s Counter 56.1 ¶ 57.)

46. Eisenberg has known and consistently done business with Edward R. Pressman ("Pressman") since 1990. (Eisenberg Dep. at 90:17-20, 154:14-17, 168:10-12.)

47. After joining AJG, Eisenberg approached Pressman to discuss possibly changing Pressman's insurance broker to AJG. (Eisenberg Dep. at 152:8-16, 158:6-17, 168:13-19.)

48. Eisenberg claims that when soliciting Pressman Corporation for business, he did not use or rely upon any

23

confidential information or trade secrets belonging to DeWitt,
but rather solely upon his longstanding relationship with
Pressman; Eisenberg claims this is the reason that Pressman
chose to move his business to AJG. (Warshaw Decl., Ex. Q at ¶
9.) Plaintiff disputes this claim. (Pl.'s Counter 56.1 ¶ 60;
Warshaw Decl. Ex. Q ¶ 5-27; Eisenberg Dep. at 71).

49.    Eisenberg had continually worked with Weinstein since
the 1980s, when it was then known as Miramax Films. (See
Eisenberg Dep. at 168:20-169:1.) Eisenberg approached Weinstein
to discuss possibly changing its insurance broker to AJG after
he started working for AJG. (See Eisenberg Dep. at 169:23-
170:2.)

50.    On June 10, June 13, August 14 and August 22, 2013,
Weinstein proceeded to replace DeWitt with AJG as its insurance
broker. (Warshaw Decl., Ex. X.)

51.    Defendants state that Weinstein moved its business
from DeWitt to AJG because of Eisenberg's relationship with the
decision-makers at Weinstein, pointing to an email Hamby sent to
other DeWitt employees, stating, "I just spoke with Tom Prince
of Weinstein who informed me that he has made the decision to
move the account to Richard Eisenberg since he is loyal to

24

Richard and values that relationship." (Warshaw Decl., Ex. N; see Hamby Dep. at 89:5-19.)

52. In soliciting Weinstein, Eisenberg claims he did not use or rely upon any confidential information or trade secrets belonging to DeWitt, but rather solely upon his longstanding relationship with Weinstein. (Warshaw Decl., Ex. Q at ¶ 14.) Plaintiff disputes this.

53. In March 2015, Weinstein changed its broker back from AJG to DeWitt, which Defendants claim is because of Weinstein's relationship with Born. (Born Dep. at 100:11-102:8; Johnson Dep. at 88:20-7.) Plaintiff believes that Weinstein returned to DeWitt because of superior servicing compared to AJG.

54. On July 1, 2013, the Dino DeLaurentis Company (the "DeLaurentis Company") made AJG its new producer of record. (Warshaw Decl., Ex. Y.)

55. Eisenberg knew and consistently worked with Dino DeLaurentis ("DeLaurentis") from the 1970s until DeLaurentis's death away in 2010. (Eisenberg Dep. at 77:14-24, 79:7-13, 91:12-17.)

56. After joining AJG, Eisenberg approached DeLaurentis's widow to discuss the possibility of changing the DeLaurentis Company's insurance brokerage to AJG. (Eisenberg Dep. at 170:10-15.)

57. When soliciting Mrs. DeLaurentis, Eisenberg claims he did not use or rely upon any confidential information or trade secrets belonging to DeWitt, but rather solely on his longstanding relationship with her and her husband. (Warshaw Decl., Ex. Q at ¶ 21.) Plaintiff disputes this, claiming that Eisenberg used improper confidential information while soliciting. (Pl.'s Counter 56.1 ¶ 70.) Mrs. DeLaurentis ultimately moved the corporate insurance policy to AJG. (Warshaw Decl., Ex. Q at ¶ 21.)

58. On July 16 and 25, 2013, Mosaic Media Group, Inc. ("Mosaic"), replaced DeWitt with AJG as its BOR. (Born Dep. at 96:23; Warshaw Decl., Ex. Z.)

59. Eisenberg has known Ted MacKinney ("MacKinney"), Mosaic's principal decision-maker for its insurance, for 25 years and before Eisenberg joined DeWitt. (See Born Dep. at 97:14-23; Eisenberg Dep. at 78:6-79:5, 160:9-13.)

60.   Eisenberg approached MacKinney after starting to work for AJG to discuss possibly changing Mosaic's insurance brokerage to AJG. (Eisenberg Dep. at 171:10-15.)

61.   In soliciting Mosaic's business, Eisenberg claims he did not use or rely upon any confidential information or trade secrets belonging to DeWitt, but rather relied solely upon his long-standing relationship with MacKinney. (See Warshaw Decl., Ex. Q, ¶ 24.) Plaintiff disputes this, claiming that Eisenberg used improper confidential information while soliciting. (Pl.'s Counter 56.1 ¶ 73.) MacKinney ultimately moved Mosaic's corporate insurance policy to AJG. (Warshaw Decl., Ex. Q at ¶ 26.)

62.   On May 16, 2013, Intersection Entertainment, LLC ("Intersection") moved its brokerage from DeWitt to AJG. (Warshaw Decl., Ex. AA.) Intersection is a David Boyle ("Boyle") company. (Eisenberg Dep. at 145:16-17.) Eisenberg has had a relationship with Boyle since Eisenberg's days with Great Northern. (See Eisenberg Dep. at 145:16-25.)

63.   A BOR letter was issued regarding the The Wolf of Wall Street film project, which moved the film's brokerage from DeWitt to AJG. (Warshaw Decl., Ex. BB.) Eisenberg received the

business related to this film through Boyle. (See Eisenberg Dep. at 145:16-25, 146:6-14).

64.   Guggenheim Partners and Kraig Fox did not move their insurance brokerage to AJG, and Defendants have received no commissions from this client. (See Declaration of Brian Kingman dated October 7, 2016 ("Kingman Decl."), ¶ 6, Dkt. 142.)

65.   The Operator was never brokered by AJG, and Defendants have received no commissions from this client. (See Kingman Decl., ¶ 7.)

66.   Eisenberg had no involvement in brokering Black Mass to AJG, nor was it confidential that the movie was going into production because the project was widely covered by trade publications. (See Kingman Decl., ¶ 8.)

67.   Although the client did issue a BOR to the Everly project, Defendants did not use any of DeWitt's confidential information to solicit this project. (See Kingman Decl., ¶ 9.)

68.   Eisenberg denies he sold his book of business to DeWitt, noting that DeWitt never paid him for his book of business: "Well, if I wasn't paid for it, why would I sell it?"

(Eisenberg Dep. at 203:8-9). "I wasn't paid for my book of business." (Eisenberg Dep. at 240:5-6.) Plaintiff disputes this, as noted above.

69.    DeWitt's claim that it purchased Eisenberg's book of business was not mentioned in DeWitt's original Complaint. (See Dkt. 1)

70.    After Eisenberg responded to DeWitt's request for injunctive relief, DeWitt argued it "effectively purchased" Eisenberg's business by paying $425,000 to settle the lawsuit between Eisenberg and DeWitt on the one hand, and Aon/AGRIS on the other. (Dkt. 9 at 4-5.)

71.    With regard to the Settlement Agreement, the Court has previously found that:

> [N]either the Settlement Agreement nor the [2012] Employment Agreement state or even refer to an explicit agreement whereby DeWitt would exclusively own Eisenberg's clients. The Settlement Agreement instead states that DeWitt purchased a "compromise" amongst the parties that "will never be construed as an admission by any of the Parties of any liability, wrongdoing or responsibility." The Employment Agreement does not make any reference to DeWitt owning Eisenberg's "book of business" or his clients.

29

(Dkt. 39 at 17-18.) Plaintiff adds that the Court has also
stated that "discovery might yield further evidence on DeWitt's
allegations that it purchased Eisenberg's 'book of business,'"
(Dkt. 57 at 7), "yield[] evidence that DeWitt purchased
Eisenberg's book of business extraneously to and independently
of the [2012] Employment Agreement," (id. at 15), or that
"Eisenberg benefitted from the use of Eisenberg's client list,
and that equity and good conscience might require restitution,"
(id.).

72.    The introductory paragraph of the 2007 Employment
Agreement states: "We are pleased to offer you the following
terms in connection with your employment by the firm as a
Director and officer of our company and the purchase of your
present and future book of business . . . ." (Warshaw Decl.,
Exs. R, S.) Defendants contend that the actual terms in the 2007
Employment Agreement relate only to Eisenberg's employment. (See
id.)

Plaintiff disputes this interpretation of the 2007
Employment Agreement. Plaintiff claims that the 2007 Employment
Agreement was for both the sale of his book of business to
DeWitt and his employment as a Vice President for five years.
(See Biging Decl., Ex. V.) Plaintiff notes that the 2007

Employment Contract and surrounding negotiations contain many
provisions that it claims support the view that the sale of his
book of business was the primary objective of the parties'
agreement, including: Eisenberg was not required to report to
DeWitt's offices, had no set hours, and could perform his duties
entirely as he saw fit, (Warshaw Decl., Ex. R at 1); he could
accept any other employment, so long as it was not in the
insurance industry, (id.); he was provided agreed compensation
based on the revenue generated by the book of business, with no
relation to any work performance requirements on his part, and
guaranteed that he could not have his employment terminated
except for cause, (see Biging Decl., Ex. X); a $90,000 up-front
bonus, which was specifically identified by DeWitt's then Chief
Operating Officer, David Paige, as payment for the book of
business, (Johnson Dep. at 62-63, 72-74, 79-81); a guaranteed
payment of $1,000,000 a year if the revenue stream from
Eisenberg's book of business could not be accessed, (see Biging
Decl., Ex. X at 2); and an indemnity, defense, and hold harmless
agreement, specifically identifying and protecting him against
any claims that might be brought against him by Aon/AGRIS, (Id.
at 3-4).

    73.   David Paige ("Paige") is DeWitt's former Chief
Operating Officer and was responsible for hiring Eisenberg.

(Paige Dep. at 10:19-11:7, 19:12-16; Johnson Dep. at 32:24-33:4.) The parties dispute Paige's recollection of the discussions surrounding Eisenberg's start at DeWitt. Defendants state that Paige does not recall any discussions with Eisenberg regarding DeWitt purchasing Eisenberg's book of business, including what Paige meant when he included the language in the October 9, 2007 Employment Agreement stating that the agreement involved the purchase of Eisenberg's book of business; what was supposedly being purchased; and any discussions with Eisenberg regarding the sale of his book of business. (See Paige Dep. at 44:7-45:15.) According to Defendants, Paige did recall that the general theme was that Eisenberg's relationships would stay with DeWitt until he retired. (Paige Dep. at 96:16-25.)

Plaintiff contends that Paige recalled negotiating with Eisenberg for the purchase of his book of business and discussing with Eisenberg that that sale was an essential term of the parties' agreement. (See Paige Dep. at 68, 85.) Plaintiff also points to the fact that after Eisenberg tried to remove the language concerning the sale of his book of business from the parties' draft agreement, Paige reinserted it. (See Paige Dep. at 85:6-15.) In a contemporaneous email, Paige stated: "I have restored the language making clear that this agreement involves the purchase of your business. As discussed, this is an

essential element of the agreement." (Biging Decl., Ex. V.)
Plaintiff contends that Paige understood there was uncertainty
arising from Eisenberg's prior sale of his book of business to
Aon/AGRIS and the non-competition provisions of Eisenberg's
consulting agreement with Aon/AGRIS as to exactly what business
Eisenberg then had the right to sell, but that Paige's hope and
expectation that at some point in the future Eisenberg would
have the ability to legally develop business for DeWitt; as
such, the agreement was specifically drafted to encompass the
sale both of Eisenberg's present book of business and his future
book of business as it might be developed at DeWitt. (See Paige
Dep. at 68-70.)

74. DeWitt's brief in support of its original application
for injunctive relief states that the 2007 Employment Agreement
was an agreement only relating to Eisenberg's employment:

In order to memorialize and confirm the understandings
and agreements entered into between DeWitt and
Eisenberg with respect to his employment for the
Company..., DeWitt had Eisenberg sign a series of
employment agreements with the Company [including the
October 7, 2007 Employment Agreement].

(Warshaw Decl., Ex. U.). Plaintiff disputes that an employment
agreement and a purchase for a book of business are mutually
exclusive.

75.     In DeWitt's papers in support of the sanction application, its position was that they could never have purchased Eisenberg's book of business because Eisenberg had already sold it to Aon/AGRIS and thus had nothing to sell; specifically, DeWitt stated:

> Nowhere in DeWitt's papers in support of either motion [for injunctive relief or sanctions] does DeWitt ever argue that it purchased Eisenberg's book of business from him. In fact, quite the contrary, it is DeWitt's argument that when he came to be employed by DeWitt, Eisenberg no longer had a book of business to sell.

(Dkt. 33). Plaintiff objects to this characterization of its arguments, which it notes were made prior to taking discovery and taking the deposition of Paige. DeWitt further notes that it expressly sought and obtained permission to pursue this legal theory by motion for permission to amend the Complaint made on January 16, 2014, (Dkt. 48), and granted by the Court on April 9, 2014, (Dkt. 57).


76.     Eisenberg's 2007 Employment Agreement makes no mention of any payment relating to the purchase of Eisenberg's business. (See Warshaw Decl., Exs. R, S; Paige Dep. at 48:3-9). The 2007 Employment Agreement notes that Eisenberg will be paid a

commission for any business he generates, plus $90,000 in "bonus compensation" to be paid in his first three months of employment without mention that these amounts relate to a sale of his business. (Warshaw Decl., Exs. R, S; Paige Dep. at 49:18-50:10, 93:21-94:7.)

In response, Plaintiff states that the 2007 Employment Agreement expressly states that the terms contained therein are in connection with not only his employment by the firm but are also in connection with the purchase of his book of business. Specifically, the contract states: "We are pleased to offer you the following terms in connection with our employment by the firm as a Director and officer of our company and the purchase of your present and future book of business related to the insurance business." (Biging Decl., Ex. X.) Additionally, Plaintiff noted that Paige specifically accounted for the $90,000 bonus as a "fee to Richard Eisenberg for purchase of book of business." (Biging Decl., Ex. AA.)

77. Defendants state that Johnson testified that the payment amounts in the 2007 Employment Agreement outline Eisenberg's compensation as Senior Vice President for DeWitt. (Johnson Dep. at 65:4-20.) Regarding the $90,000 amount set forth in the 2007 Employment Agreement, Johnson testified, "It's

referred to as a bonus, so it's a bonus." (Johnson Dep. at 45:6-8.) When asked what the bonus related to, Johnson testified that he did not recall. (See Johnson Dep. at 45:23-46:2.)

Plaintiff augments the above statement as to Johnson's testimony. It notes that Johnson testified that the $90,000 was part of the purchase price. (Johnson Dep. at 61-63 ("And, as part of that purchase, we were also affording him $90,000 . . . We consider the $90,000 as part of a much greater compensation purchase for the book of business, including a guarantee to indemnify him, as its stated in here. A million dollars if the business doesn't come"),72-74 (testifying that payment of $90,000 as well as $425,000 settlement payment to Aon constituted a purchase of Eisenberg's book of business over time), 79-81 (testifying that Eisenberg was paid $90,000 and 30% commission and eventually was paid a draw of almost $200K).)

78.    The 2007 Employment Agreement does not make reference to the names of any of the clients or accounts which are supposedly being purchased. (See Warshaw Decl., Exs. R & S.) Plaintiff disputes that such a listing was necessary because the purchase was for Eisenberg's entire book of business.

79.    Defendants state that Eisenberg's 2012 Employment
Agreement constituted the entire agreement and understanding
between the parties, and supersedes all prior agreements between
the parties, including the 2007 Employment Agreement. (Warshaw
Decl., Ex. T at ¶ 13.) Plaintiff disputes that notion that the
purchase and sale of Eisenberg's business was part of the
subject matter related to the 2012 Employment Agreement, and as
such those terms of the 2007 Employment Agreement are not
superseded.


80.    This Court has previously held that that "[t]he [2012]
Employment Agreement does not make any reference to DeWitt
owning Eisenberg's 'book of business' or his clients." (Dkt. 39
at 17-18.)


81.    Johnson stated that he had no discussions with
Eisenberg regarding the purchase of his book of business and was
not involved in any of the negotiations. (See Johnson Dep. at
50:13-23, 57:24-58:6.)


82.    Johnson testified that DeWitt "purchased" Eisenberg's
book of business via the October 9, 2007 Employment Agreement by
paying him a salary and commissions; by paying Eisenberg a
$90,000 "bonus"; by providing him with a guarantee of $1 million

in the event his income stream was stopped due to a legal action or threatened legal action; and providing him with indemnification if a suit was brought against him by Aon/AGRIS. (See Johnson Dep. at 62:7-63:7.)

83. Defendants note that Johnson decided to remove the $1 million guarantee from Eisenberg's original October 9, 2007 Agreement and had Eisenberg sign a backdated new version of that agreement which eliminated that provision. (Warshaw Decl., Exs. R & S.) Plaintiff dispute this timing, noting that the guarantee was in place until after Paige left, sometime in 2008, and was removed only after it was at that point a superfluous provision given that the book of business had been successfully transitioned to DeWitt, the revenue from Eisenberg's accounts had been accessed, and Eisenberg agreed that there was no need for the provision. (See Johnson Dep. 49-56.)

84. Johnson has stated that nobody actually wrote a check to Eisenberg to purchase his book of business "because Eisenberg didn't own his business. Aon owned his business." (Johnson Dep. at 63:16-17.) Plaintiff disputes this point by noting other portions of Johnson's deposition, as discussed above.

85.    Johnson has also stated that he is not aware of whether Eisenberg actually agreed that if the Aon/AGRIS lawsuit was settled on his behalf he was selling his book of business; he had no discussions with Eisenberg about this issue, and doesn't know if anyone else at DeWitt ever did; he is not aware of any document signed by the parties indicating that by settling the lawsuit of his behalf, DeWitt was purchasing Eisenberg's book of business; and is not aware of any communication stating that by virtue of the fact a settlement was reached Eisenberg had sold his book of business to DeWitt. (See Johnson Dep. at 76:14-21, 78:9-79:9.)

Plaintiff similarly disputes this and notes that Paige's email to Eisenberg made clear that sale of the book of business was an essential element of the agreement and clearly referenced in the 2007 Employment Agreement. Plaintiff further notes that Johnson testified that DeWitt viewed the Settlement Agreement as the final step in DeWitt's purchase of his book of business from Eisenberg over time. (See Johnson Dep. at 72-74 (testifying that payment of $90,000 as well as $425,000 settlement payment to Aon constituted a purchase of Eisenberg's book of business over time); Biging Decl., Ex. EE, ¶ 11 ("But there is no question whatsoever that Eisenberg is actively diverting DeWitt clients, and actively and aggressively taking action to deprive DeWitt of

39

all of the accounts, relationships and associated goodwill that
DeWitt effectively purchased from Aon in its settlement with
that company in 2009"); Johnson Dep. at 64 (. . . "we paid
$425,000 for the business"), 72 (testifying that DeWitt's
settlement payment was part of the entire package); 73 ("The way
we at DeWitt, the partners at DeWitt, looked at this was that we
paid Richard what was offered in this agreement. We agreed to
indemnify him. He agreed to the million dollars, the 90,000 and
the 425,000 as compensation by [sic] purchasing Richard's book
of business").)

86.     When asked why DeWitt would have to settle the
Aon/AGRIS litigation in 2009 in order to purchase Eisenberg's
book of business if it had already purchased the book of
business via the 2007 Employment Agreement, Johnson responded
that DeWitt had not purchased Eisenberg's book of business
pursuant to the 2007 Employment Agreement, but, instead, that it
purchased the business "over the course of time," though no one
ever discussed that with Eisenberg:

Q:     I'm still not clear on why you would have to
settle the case [with Aon/AGRIS] to purchase his book of
business if you had already purchased his book of
business . . . . Could you explain it to me?

A:     Could you repeat it?

Q: Sure. Is it your position that Richard's business was purchased as of October 9, 2007; yes or no?

A: No.

Q: Then when was it purchased for the first time?

A: Over the course of time.

Q: So, was there any discussion with Richard that his book of business was going to be purchased over the course of time when he came to DeWitt?

A: I don't know. I wasn't involved in the negotiation.

(Johnson Dep. at 73:18-74:17.) Plaintiff disputes this characterization for reasons noted above.


87. At the deposition of DeWitt's CEO Jolyon Stern ("Stern"), Stern was asked whether DeWitt ever purchased a broker's book of business, to which he testified that the only books of business he recalled buying were that of John Hamby, and that of another unnamed broker from 30 years ago. (See Warshaw Decl., Ex. F ("Stern Dep."), at 13:6-17, 46:11-25.) Only on cross-examination when asked if DeWitt had ever purchased Eisenberg's book that Stern said DeWitt had purchased Eisenberg's book of business. (Stern Dep. at 47:2-4.)

Plaintiff disputes this as a mischaracterization of the line of questioning and testimony of Stern. Plaintiff notes that

specific line of questioning was "In the last -- let's say in the last seven years, has DeWitt expanded its business by purchasing other brokerages?" and "Has DeWitt expanded its business over that period of time by purchasing books of business of any individual producers?" The deposition of Jolyon Stern took place on April 28, 2015. Accordingly, seven years before April 28, 2015 would be April 28, 2008. Eisenberg's book of business was purchased pursuant to the October 2007 Contract, which was more than seven years before the date of Stern's deposition. When asked directly if DeWitt purchased Eisenberg's book of business, Stern answered in the affirmative. (Stern Dep. at 47:2-4).

88.    Stern also testified that he recalled that Eisenberg was paid $400,000 for his book of business, an amount inconsistent with the alleged purchase of the book of business. (Stern Dep. at 47:21-48:2.) Plaintiff disputes this insofar as Stern's testimony was that he was not sure exactly but a $400,000 figure "is floating around." (Stern Dep. at 47:21-48:2.)

89.    On April 17, 2013, shortly before he resigned from DeWitt, Eisenberg forwarded emails to Brian Kingman ("Kingman") at AJG regarding one distinct film project titled "Big Eyes"

produced by Weinstein. (See Eisenberg Dep. at 341:3-23, 342:9-343:3; Warshaw Decl., Exs. G & L.) However, Big Eyes was placed with DeWitt, and DeWitt obtained all of the commissions relating to the insurance of this film. (Born Dep. at 110:13-21; Eisenberg Dep. at 342:15-16.) AJG did not have any involvement in the placement of this film. (Eisenberg Dep. at 343:4-8.) Defendants state that none of the information contained in the emails that Eisenberg forwarded to Kingman was confidential information belonging to DeWitt because Eisenberg could have obtained the same information from his contact at Weinstein at any time. (Warshaw Decl., Ex. P at ¶ 34.) DeWitt disputes this and contends that the information sent to AJG was confidential and violated the 2012 Employment Agreement for reasons already stated above.

90.    On April 30, May 2, and May 4, 2013, emails were sent from Eisenberg's DeWitt email account to his personal email account, which was prior to his joining AJG on May 6, 2013. (Dkt. 60, ¶¶ 47-50). Defendants state that Eisenberg never used any of the information in these emails to solicit any of DeWitt's customers, (see Warshaw Decl., Ex. P, ¶ 35), and that none of the customer information contained in these emails was DeWitt's confidential information, (see id.). After joining AJG,

Defendants state that Eisenberg asked the customers to re-send him the information contained in the emails. (See id.)

Plaintiff does not dispute the first sentence of the previous paragraph, but disputes the remainder because it contends that by the terms of the 2012 Employment Contract, under which it claims Eisenberg was prohibited from sending information obtained in the course of his work for DeWitt to others or his personal email accounts. (See Biging Decl., Ex. II, ¶ 5(a).)

91.    The SAC did not include the name of a single client who moved from DeWitt to AJG based upon any supposed breach of loyalty by Eisenberg. (See Dkt. 60.)

92.    On May 6, 2013, DeWitt commenced this action against Eisenberg by filing a Complaint and Order to Show Cause seeking injunctive relief. (Dkt. 1.) The Complaint contained causes of action for: claim for declaratory relief (Count I); breach of contract (Count II); claim for temporary, preliminary and permanent injunctive relief (Count III); misappropriation of confidential information and/or trade secrets (Count IV); breach of fiduciary duty (Count V); breach of duty of loyalty (Count

VI). (Id.) Eisenberg opposed the application for injunctive relief. (Dkt. 5.)

93. On June 4, 2013, this Court entered an Opinion and Order granting DeWitt's application for preliminary injunctive relief to the extent it prohibited Eisenberg from future violations of his October 9, 2012 Employment Agreement. (Dkt. 12.) Specifically, the Court ruled that Eisenberg was prohibited from disclosing, misusing, or misappropriating DeWitt's confidential information or trade secrets; was required to return all DeWitt property in his possession; was prohibited for two years from using DeWitt's confidential information or trade secrets to solicit, accept, divert or take away any clients of DeWitt; and was prohibited for two years from recruiting or soliciting any DeWitt employees. (Id.)

94. The Court also ruled that Eisenberg was free to compete with DeWitt so long as he did not utilize DeWitt's confidential information: "Mr. Eisenberg's Employment Agreement does not prohibit [him] from competing with DeWitt in this new role so long as he is not using confidential information obtained during his employment with DeWitt . . . ." and that Eisenberg was free to solicit client contacts that he knew through pre-existing relationships: "[Eisenberg's Employment

Agreement] does not prevent him from soliciting clients retained through 'pre-existing' relationships or through his 'own independent efforts, unassisted by the firm.'" (Dkt. 12 at 12 (citation omitted).)

95. On June 18, 2013, DeWitt filed its FAC adding Eisenberg's new employer AJG as a defendant. (Dkt. 15.) The FAC contained the following causes of action: claim for declaratory relief (Count I); breach of contract against Eisenberg (Count II); misappropriation of confidential information and/or trade secrets against Eisenberg and AJG (Count III); breach of fiduciary duty against Eisenberg (Count IV); breach of duty of loyalty against Eisenberg (Count V); preliminary and permanent injunctive relief against Eisenberg (Count VI); tortious interference with contractual relations against AJG (Count VII); aiding and abetting breach of duties against AJG (Count VIII); unfair competition against Eisenberg and AJG (Count IX); and intentional interference with business relations against Eisenberg and AJG (Count X). (Id.)

96. On July 12, 2013, Defendants timely filed an Answer to the FAC, and Eisenberg filed a Counterclaim asserting causes of action against DeWitt for breach of employment agreement, unjust

46

enrichment/restitution, and failure to pay wages under the New York Labor law. (Dkt. 18.)

97.    On July 17, 2013, DeWitt filed an application for sanctions, claiming that Eisenberg and AJG had violated the terms of the Court's June 4, 2013, (Dkt. 12), order by Eisenberg's continued solicitation of customers with whom he had pre-existing relationships prior to joining DeWitt, (Dkt. 22). Eisenberg and AJG opposed DeWitt's sanction motion. (Dkt. 29.)

98.    On October 29, 2013, this Court issued an Opinion and Order denying DeWitt's application for sanctions. (Dkt. 39.) In so doing, the Court reiterated that Eisenberg was not prohibited from competing with DeWitt so long as he did not utilize DeWitt's confidential information, and also that Eisenberg was not prohibited from soliciting clients retained through pre-existing relationships. (Id. at 13.)

99.    As part of that opinion, this Court found that Eisenberg had only solicited clients with whom he had a pre-existing relationship, and that nothing about the identities of those clients or the contacts at those clients constituted DeWitt's confidential information:

> The BOR letters show that Eisenberg has solicited
> clients with whom he had relationships pre-dating
> DeWitt.... As a matter of law, Eisenberg's own
> recollection of his customers or pre-existing
> relationships cannot constitute confidential
> information.... Nothing about the names or identities
> of accounts or clients, nor the contacts at those
> accounts, is confidential or a trade secret belonging
> to DeWitt.

(Dkt. 39 at 15-16).

100. At that time, this Court discussed DeWitt's argument that it "purchased" DeWitt's book of business by settling a lawsuit between Eisenberg's former employer, AON, on the one hand, and Eisenberg and DeWitt on the other by stating:

> [N]either the Settlement Agreement nor the [2012]
> Employment Agreement state or even refer to an
> explicit agreement whereby DeWitt would exclusively
> own Eisenberg's clients. The Settlement Agreement
> instead states that DeWitt purchased a "compromise"
> amongst the parties that "will never be construed as
> an admission by any of the Parties of any liability,
> wrongdoing or responsibility." The [2012] Employment
> Agreement does not make any reference to DeWitt owning
> Eisenberg's "book of business" or his clients.

(Dkt. 39 at 17-18).

101. On April 16, 2014, DeWitt filed the SAC containing the same claims as the FAC but adding a claim for unjust enrichment against Eisenberg (Count XI). (Dkt. 60.) Defendants timely filed an Answer to the SAC on April 30, 2014. (Dkt. 61.)

2. The Facts as Relevant to Plaintiff's Motion for Summary
   Judgment

With respect to Plaintiff's motion for summary judgment,
the following facts are set forth in the Plaintiff's Statement
of Undisputed Material Facts Pursuant to Local Rule 56.1 ("Pl.'s
56.1"), (Dkt. 121), the Defendants' Response to Plaintiff's
Statement of Undisputed Fact Pursuant to Local Rule 56.1
("Defs.' Counter 56.1"), (Dkt. 139), and accompanying
declarations and exhibits, which together form the basis of the
following factual recitation unless otherwise noted. The facts
are not in dispute except as otherwise noted.

1.   DeWitt is a privately held company that until
September 2014 was engaged in the business of insurance
brokering and risk management, with a focus on the procurement
of insurance primarily for individuals and entities in the
entertainment industry. (Hamby Decl., ¶ 2.)

2.   In addition to procuring insurance for Broadway shows,
DeWitt also regularly procured insurance for clients involved in
the production of television shows and movies. (Hamby Decl.,
¶ 3.)

3.    Although DeWitt remains an active corporation, on September 26, 2014, DeWitt sold its business to Risk Strategies Company ("RSC"). (See Biging Decl. Ex. A, Ex. B at 8-10, 46; Hamby Decl., ¶ 8.)

4.    The sale was based on a purchase price calculated based upon a multiple of 10.6 times the preceding 12 months' earnings before interest, taxes, depreciation and amortization ("EBITDA"). (See Hamby Decl., ¶ 8; Biging Decl. Ex. A.)

5.    Like most brokers, DeWitt earned compensation for the procurement of insurance for its clients primarily from applying a commission against the dollar value of the premiums paid on the insurance purchased by their clients. (See Hamby Decl., ¶ 6; Walker Decl., ¶ 3.)

6.    DeWitt also earned supplemental compensation through profit sharing. (Walker Decl., ¶ 3.)

7.    This compensation can be paid by insurers to brokers based on a variety of factors such as volume or loss ratios, related to DeWitt's total business placed with that insurer. (See Walker Decl., ¶ 3.)

8.    DeWitt's employees consisted, for the most part, of brokers, account executives, customer service representatives, and clerical staff. (Hamby Decl., ¶ 4.)

9.    Among the brokers, the individuals who had ability to develop and build client relationships were referred to as "producers." (Hamby Decl., ¶ 5.) Defendants dispute this, noting that Johnson testified that there are no producers in the entertainment department—rather, there are account managers who also produce. (See Johnson Dep. at 83:4-10.)

10.    As client relationships are critical to the ability of insurance brokerages to generate revenues, producers are a critical component of the business and their customer relationships are extremely valuable. (See Hamby Decl., ¶ 5.)

11.    Producers are typically compensated based, at least in part, on the value of the business they generate for the insurance brokerage on an annual basis. (See Hamby Decl., ¶ 6.)

12.    The business relationships that they have developed and can rely upon to generate commissions annually on the purchase of insurance are typically referred to as their "book of business." (Hamby Decl., ¶ 7.)

13. Eisenberg is an insurance broker with an over forty year work history in the entertainment insurance industry, who primarily sells insurance products to film and television studios to provide them with insurance protection against risks faced in the course of their film and television productions.

14. AJG is a subsidiary of Arthur J. Gallagher & Co, which provides a variety of insurance services worldwide, including services for the entertainment industry.

15. According to the Business Insurance rankings for 2015, AJG was listed as the third largest US brokerage, with annual revenues in 2014 in excess of $2.4 billion from U.S. revenues, and over $3.5 billion worldwide. (See Biging Decl., Ex. E.)

16. Eisenberg owned a New York insurance brokerage business for a number of years called Great Northern. (See Biging Decl., Ex. C, ¶¶ 3-10; id., Ex. F.)

17. The book of business at Great Northern consisted entirely of relationships Eisenberg had built with a number of television and movie production companies over his many years in

the film production and entertainment insurance industry. (See Biging Decl., Ex. C, ¶¶ 2, 10; id., Ex. DD at 197-98, 326.)

18. Eisenberg sold Great Northern to Aon/AGRIS in March 2001. (See Biging Decl., Ex. F; id., Ex. C, ¶ 10.)

19. As part of the sale, Eisenberg sold Great Northern's business, its accounts, and all of the associated goodwill to Aon/AGRIS. (See Biging Decl., Eisenberg Dep. at 23, 33-34, 118; id., Exs. G, 4 (together, "Robey Dep.") at 10-15, 19, 24-25.)

20. In selling his book of business to Aon/AGRIS, it was understood that Eisenberg was not just selling the accounts, but the right to exploit the business relationships GNBC had with the individuals making up the book of business. (Robey Dep. at 27-29, 53; Biging Decl., Ex. H.) As compensation for his sale of GNBC's business, client accounts, and associated goodwill to Aon/AGRIS, Eisenberg was paid more than $400,000. (See Eisenberg Dep. at 24; Biging Decl., Ex. F; Robey Dep. at 38.)

21. In conjunction with the sale of GNBC's business to Aon/AGRIS, Eisenberg was at the same time hired as a consultant to continue to service the book of business being transferred to Aon/AGRIS pursuant to a consulting agreement he entered into

with Aon/AGRIS in 2001. (See Eisenberg Dep. at 19, 30-31; Biging Decl., Ex. I.)

22.    The consulting agreement entered into between Eisenberg and Aon/AGRIS contained restrictive covenants preventing him for a period of 3 years from soliciting his now former GNBC clients and current Aon/AGRIS clients for another firm, or competing with Aon/AGRIS for same if he were to terminate his consulting agreement. (See Eisenberg Dep. 30-31; Biging Decl., Ex. I.)

23.    Plaintiff states that, beginning in or about June of 2007, Eisenberg began negotiating with the Paige, to sell his book of business, to the extent he could lawfully do so, and as he might develop it going forward, to DeWitt, and to accept employment at DeWitt to manage and develop the book for DeWitt. (See Paige Dep. at 11, 21, 40-43; Eisenberg Dep. at 101, 234.) Defendants dispute the notion that Eisenberg negotiated the sale of his book of business with Paige for reasons already enumerated above.

24.    Eisenberg heavily negotiated his employment agreements with the assistance of private legal counsel of his own choosing.

25.    According to Plaintiff, with Eisenberg in his early seventies at the time and presumably considering the possibility of retirement in the not-too-distant future, Paige contemplated that the business Eisenberg brought over or developed at De Witt would stay with De Witt after Eisenberg retired. (See Paige Dep. at 65-66.)

Defendants dispute this, noting that Paige did not testify that he presumed Eisenberg would be considering the possibility of retirement in the not-too-distant future; and testified that he and Eisenberg discussed the thought that at some point in the future Eisenberg was anticipating retiring. (See Paige Dep. at 67:16-24) and when asked what would happen if Eisenberg's relationships left before he retired, Paige responded: "It would be like any producer whose relationships left . . . . That the relationships leave and you do the best you can." (Defs.' 56.1 ¶ 81.)

26.    During the course of their discussions, Paige and Eisenberg exchanged a number of drafts of their agreement, and Eisenberg had a lawyer review them on his behalf. (See Biging Decl., Exs. L-W.)

27.     In one of the later drafts, Eisenberg removed the
language from the contract noting that their agreement included
the sale of his insurance related business as it existed and as
it might develop going forward at De Witt. In response, Paige
reinserted that language, advising that this was an essential
part of the agreement. (See Biging Decl., Exs. U & Y.)
Defendants dispute this statement insofar as it states that
Eisenberg and DeWitt entered into a contract for the sale and
purchase of Eisenberg's "present and future" book of business.


28.     Paige noted that he had "restored the language that
makes clear that we are both committing for five years, and that
neither can terminate except for cause," noting in doing so that
"if you can leave sooner without cause, we do not have much of a
'sale' here." (Paige Dep. at 85-86.) Defendants dispute that
Eisenberg and DeWitt entered into a contract for the sale and
purchase of Eisenberg's "present and future" book of business.


29.     Plaintiffs state that, at the completion of their
negotiation over the contract terms, Eisenberg and DeWitt
entered into a contract for the sale and purchase of his
"present and future" book of business and his employment at
DeWitt on October 9, 2007. (See Biging Decl., Ex. X; Walker Dep.
at 73, 75-76; Johnson Dep. at 58-59, 61-63, 72; Eisenberg Dep.

at 202.) Defendants admit the 2007 Employment Agreement sets
forth the terms of Eisenberg's employment until it expired in
2012, but dispute that the agreement was a sale of Eisenberg's
business.

30. Although Paige had obtained a legal opinion that the
terms of Eisenberg's non-compete agreement with Aon/AGRIS were
unenforceable as a matter of law, he was aware that there was
some uncertainty as to what business Eisenberg would legally be
entitled to bring with him given the terms of his consulting
agreement with Aon/AGRIS. (Paige Dep. at 67-70, 81-82.)

Defendants dispute this statement by noting that Johnson
has stated that "DeWitt's prior COO was under the belief that
the agreement was unenforceable under California law," (Biging
Decl., Ex. EE, ¶ 6), that Paige's August 27, 2007 email states,
"He has a breakable non-compete with Aon," (Paige Dep. at 39:14-
19), that Paige testified: "Q: Do you recall discussions with
anyone at DeWitt regarding the enforceability of his
restrictions [with Aon/AGRIS] before he was hired by DeWitt? A:
I don't recall that. It could have happened. I just don't know.
. . . . Q: The question is, do you remember any discussions with
anyone at DeWitt about the fact that it might be an issue for
Richard to solicit the business that he had worked with at Aon?

A: I don't remember that," (Paige Dep. at 28:17-22, 29:25-30:6),
and that when asked if what was stated in the SAC was true,
*i.e.*, "DeWitt's then COO believed that under the applicable law
the restrictive covenant in his agreement with Aon/AGRIS were
unenforceable as contrary to fundamental public policy in CA and
DeWitt initially supported Eisenberg's effort to obtain
declaratory injunctive relief to this effect", Paige responded:
"I have no memory as to what my belief was at the time," (Paige
Dep. at 30:15-25; 31:5-6).

31.   As a result, Plaintiffs state that Paige drafted the
purchase and sale language of the October 2007 Contract to
reference both his present and future book of business as it
might be developed at DeWitt with De Witt's financial backing
and support. (Paige Dep. at 67-70; Johnson Dep. at 58-59, 61-63,
72.) Defendants dispute that the 2007 Employment Agreement was a
sale of Eisenberg's business.

32.   As part of their agreement, DeWitt agreed to pay
Eisenberg a $90,000 bonus in advance of any commission he might
generate on insurance sold to the clients making up the book of
business being brought to DeWitt, plus compensation amounting to
30% of the annual commission revenues he generated for De Witt,
based in large part, on the book of business being moved to

DeWitt, and 5% of that amount towards entertainment expenses.
(See Biging Decl., Exs. X, Z, AA; Johnson Dep. at 62-63, 72-74,
79-81; Paige Dep. at 101-102; Eisenberg Dep. 51-53, 204, 207.)
Defendants dispute that the 2007 Employment Agreement was a sale
of Eisenberg's business.

33.    Eisenberg also received medical benefits and 401k plan
participation. (See Biging Decl., Ex. X.)

34.    Plaintiff states that DeWitt also agreed to commence
and fund a litigation on Eisenberg's behalf to attempt to obtain
a legal ruling extricating him from the non-solicitation and
non-compete provisions of his consulting agreement with
Aon/AGRIS, and defend, indemnify and hold him harmless against
any counterclaim Aon/AGRIS might bring against him. (See Biging
Decl., Exs. X & CC; Johnson Dep. at 72-74, 136-138; Eisenberg
Dep. at 207; Paige Dep. at 90.)

Defendants admit that Eisenberg's 2007 Employment Agreement
contained an indemnification provision but dispute that DeWitt
and Eisenberg agreed that DeWitt would fund a lawsuit on
Eisenberg's behalf. Furthermore, they note that when Paige was
asked to testify regarding the filing of the Aon lawsuit, he
could not recall who filed the lawsuit, or whose idea it was:

Q: Do you remember anything about the [Aon/AGRIS] lawsuit?

A: No.

Q: Do you remember who filed the lawsuit?

A: No.

...

Q: Do you know if it was Mr. Eisenberg's idea to file a lawsuit or DeWitt's idea?

A: I have no clue.

Q: Do you have any recollection of what Aon's claims were against Mr. Eisenberg and DeWitt?

A: No.

(Paige Dep. at 57:19-58:12.)

35. The litigation with Aon/AGRIS was commenced, at DeWitt's expense, on the day the October 2007 Contract was signed. (See Walker Decl., ¶ 2.)

36. Plaintiff states that, in addition to all of this consideration for the purchase of his book of business as it existed and could lawfully be transferred to DeWitt, and as it might be developed with DeWitt's assistance and financial backing going forward, DeWitt also agreed that Eisenberg could take work in any other industry if he so chose. (See Biging

Decl., Ex. X.) Defendants again dispute that the 2007 Employment Agreement was a sale of business.

37.    According to Plaintiff, DeWitt further agreed that if for any reason he was blocked from being able to move the book of business to De Witt and generate commissions thereon, DeWitt would pay him $1 million. (See Biging Decl., Ex. X at 2.) Defendants dispute this, noting that Johnson decided to remove the $1 million guarantee from Eisenberg's original October 9, 2007 Agreement and had Eisenberg sign a backdated new version of that agreement which eliminated that provision, (see Defs.' 56.1 ¶ 91) and also admitted that nobody actually wrote a check to Eisenberg to purchase his book of business "because Eisenberg didn't own his business. Aon owned his business," (id., ¶ 92.)

38.    Plaintiff states that DeWitt further agreed Eisenberg could only be terminated for cause, which both Eisenberg and Paige understood and agreed was critical to the sale of his book of business aspect of the agreement. (See Biging Decl., Ex. X, at 2; Paige Dep. at 50, 98-99; Eisenberg Dep. at 204, 329.) Defendants dispute that the 2007 Employment Agreement was a sale of Eisenberg's business.

39. Under the 2007 Employment Agreement, Eisenberg was hired by DeWitt in the capacity of Director with the title Senior Vice President on or about October 9, 2007 for a five year period. (Biging Decl., Ex. X; Johnson Dep. at 65.)

40. In this capacity of Director with the title Senior Vice President he was responsible for producing insurance accounts on behalf of DeWitt; he had no set hours, no obligation to report to DeWitt's offices, and could perform his duties entirely as he saw fit.

41. Plaintiff states that DeWitt attempted on Eisenberg's behalf to obtain declaratory relief to the effect that under the applicable law the restrictive covenants in his agreement with Aon/AGRIS were unenforceable as contrary to fundamental policy in California. (See Biging Decl., Ex. C, ¶ 13.) Defendants admit that DeWitt filed a lawsuit seeking declaratory relief that Eisenberg's restrictive covenants with Aon/AGRIS were unenforceable but dispute that the lawsuit was filed on Eisenberg's behalf for reasons stated above.

42. In responding to the Complaint filed on Eisenberg's behalf, Aon/AGRIS filed a cross-complaint naming Eisenberg, DeWitt, Born and others as defendants, and asserting the

following claims for relief against Eisenberg and DeWitt: (1)
breach of the consulting agreement against Eisenberg; (2) breach
of the covenant of good faith and fair dealing against
Eisenberg; (3) breach of the duty of loyalty against Eisenberg;
(4) aiding and abetting the breaches of duties of loyalty
against DeWitt; (5) conspiracy against Eisenberg and DeWitt; (6)
intentional interference with economic relations against
Eisenberg and De Witt; (7) unfair competition against Eisenberg
and De Witt; (8) misappropriation of trade secrets against
Eisenberg and DeWitt; (9) accounting and constructive trust
against DeWitt; and (10) declaratory relief against Eisenberg.
(Biging Decl., Ex. C, ¶ 16.) Defendants admit that a cross-
complaint was filed by Aon/AGRIS asserting the claims as set
forth above but again dispute that the lawsuit was filed on
Eisenberg's behalf for reasons already stated.

43. The cross-complaint also sought preliminary and
permanent injunctive relief enjoining all of the defendants,
including Eisenberg and DeWitt, from soliciting Aon/AGRIS
employees; from using or disclosing any confidential information
and trade secrets of Aon/AGRIS; from soliciting Aon/AGRIS
clients in violation of contractual, statutory and common law
prohibitions against unfair competition; and from engaging in
similar acts of unfair competition and misappropriation of trade

secrets against Aon/AGRIS and other persons in the future. (See Biging Decl., Ex. C.)

44. DeWitt expended approximately $176,000 litigating the claims and cross-claims in the Aon/AGRIS litigation. (Walker Decl., ¶ 2.)

45. Plaintiff states that after the issues had been litigated for a period of months, DeWitt concluded that Aon/AGRIS had a right to be compensated for the book of business Eisenberg had sold and brought over to DeWitt and subsequently paid an additional $425,000 to settle the claims asserted against Eisenberg and DeWitt and obtain a release on Eisenberg's behalf from all restrictions placed on him by the terms of his consulting agreement with Aon/AGRIS. (See Biging Decl., Ex. EE, ¶ 6; Biging Decl., Ex. CC; Eisenberg Dep. at 111, 211.) Defendants dispute that DeWitt concluded that Aon/AGRIS had a right to be compensated for Eisenberg's book of business.

46. Plaintiff contends that, as a result of DeWitt's obtaining of a release from Aon/AGRIS on Eisenberg's behalf, Eisenberg was freed from all personal exposure to Aon/AGRIS, given the right to lawfully solicit back the business he had previously sold to Aon/AGRIS on DeWitt's behalf, and that this

constituted the transfer of Eisenberg's book of business to
DeWitt. Defendants dispute this statement for reasons stated
above.

47.     To Plaintiff, the "book of business" Eisenberg
built at GNBC, sold to Aon/AGRIS, and subsequently sold to
DeWitt, is comprised of his relationships with key people at
television and film production studios. (See Paige Dep. at 41,
62; Robey Dep. at 13-14, 29; Eisenberg Dep. at 197.) The
Defendants admit that Eisenberg developed a book of business
based upon his decades-long personal relationships that he built
throughout the course of his lengthy career in this industry,
but dispute the remaining allegations, including that Eisenberg
sold his book of business to DeWitt.

48.     Unlike property insurance sold for a commercial or
residential building, or directors and officers insurance for a
company's officers and directors, independent film and
television production insurance is "non-recurring." (See Biging
Decl., Ex. D at 40-42, 166; Paige Dep. at 60-61; Robey Dep. at
16-20.)

49.     Once a film or television production has been
completed, the insurance is canceled and coverage for things

like the cast, the sets and the props are terminated once and for all.

50.   The result is that the relationships with key account contacts at these production companies who have the responsibility for procuring insurance and the discretion to choose the broker they use to procure the insurance are critical. (See Paige Dep. at 62; Hamby Dep. at 48-50.)

51.   Plaintiff states that these relationships are the book of business. (See Biging Decl., Ex. C, ¶ 2; Robey Dep. at 13, 28-29.) Defendants dispute this framing, preferring to state that Eisenberg's book of business was based upon his longstanding personal relationships and reputation. (See Hamby Dep. at 48:14-49:24.)

52.   Plaintiff states that as part of Eisenberg's sale of his book of business to DeWitt, Eisenberg took various clients and key client contacts with him to De Witt. (See Born Dep. at 59, 100; Eisenberg Dep. at 51.) Defendants admit that Eisenberg brought his decades-long personal relationships with clients with him to DeWitt, but again dispute that Eisenberg sold his book of business to DeWitt.

53.     In order to enable him to properly service these clients, at Eisenberg's request, DeWitt hired two Aon/AGRIS account representatives who had formerly serviced the clients who made up Eisenberg's book of business, Born and Bond. (See Paige Dep. at 63-64; Johnson Dep. at 42-43; Hamby Dep. at 30-31.)

54.     Born and Bond were paid a combined salary in excess of $300,000 annually. (See Johnson Dep. at 83-84.)

55.     According to Plaintiff, Born was an important part of bringing Eisenberg over to DeWitt. (See Paige Dep. at 74.) Defendants dispute this and note that Eisenberg, not Born, was the person who cultivated relationships with clients.

56.     Plaintiff states that DeWitt paid for Eisenberg to visit clients in Hollywood, paying on one occasion a $16,000 hotel bill he had generated at the Beverly Hills Hotel, and subsequently paid for one-half of the rent on an apartment in Hollywood for Eisenberg to stay in when he was in LA to meet with and entertain clients. (See Eisenberg Dep. at 59-61, 72-75, 119; Johnson Dep. at 87-88; Paige Dep. at 64-65.)

Defendants note that under the terms of his contract, he was entitled to travel expenses, client development expenses, and rent and, furthermore, that he did not recall submitting any expenses throughout the term of his employment under the 2012 Employment Agreement aside from those travel and entertainment expenses incurred for purposes of developing and soliciting business. (See Eisenberg Dep. at 59:18-21, 61:16-19, 73:17-75:11.) Under the 2012 Employment Agreement, Eisenberg was entitled to payment by DeWitt towards his 50% of the rent of residence in California, a residence that DeWitt also used while Eisenberg was not there. (See Eisenberg Dep. at 59:22-60:3, 60:21-24.)

57.    DeWitt provided Eisenberg with access to offices in New York and California from which to service and grow the business on DSG's behalf. (See Biging Decl., Ex. EE, ¶ 4.) Defendants highlight that the offices were provided to Eisenberg to grow his work on the coasts. (See id.)

58.    Following the completion of the initial 5 year term of the employment provisions of the October 2007 Contract, Eisenberg executed the 2012 Employment Agreement on October 9, 2012 in which he agreed, among other things, (a) not to compete with the Company during the term of his employment, (b) not to

improperly disclose the Company's confidential information or trade secrets, (c) not to forward Company property (including emails) to his personal e-mail account, and (d) not to use the Company's confidential information or trade secrets to solicit, during the term of his employment and for two (2) years following the termination of his employment, any clients or Prospect of the Company. (See Biging Decl., Ex. II.)

59.     In the 2012 Employment Agreement, under paragraph 5(a), Eisenberg agreed that "by signing this Agreement, Employee acknowledges and agrees that the restrictive covenants contained in this Agreement are reasonably necessary to protect Company's business interests and that during and after the term of this Agreement Employee will not use or disclose, directly or indirectly, and will keep strictly secret and confidential all Confidential Information and Trade Secrets except as required in the course of Employee's employment by Company." (See Biging Decl., Ex. II.)

60.     By the express terms of the Employment Agreement, "confidential information" was specifically defined as follows:

> [A]ll information (whether or not specifically labeled or identified as confidential, and whether oral, written, or in any electronic medium) relating to Company's trade secrets, knowledge, data, financial

information, business methods and techniques, technology, processes, innovations, concepts, names and lists of accounts, employees, customers, clients, vendors, expiration information, names of key account contacts, account characteristics, application information, and all other information relating to Company that is unique, proprietary, or not in the public domain. Trade Secrets is defined as all information that Company reasonably informs Employee (whether orally or in writing) from time to time is a trade secret, as well as any other Confidential Information reasonably the subject of trade secret protection. Such information is considered secret and is disclosed to Employee in confidence.

(See Biging Decl., Ex. II.)


61. According to Plaintiff, it is standard business practice in the industry to define the parameters of what is considered to be Confidential Information in the context of a written agreement and in much the same way as was defined by the Employment Agreement. (See Robey Dep. at 53; Hamby Dep. at 51-53, 84; Johnson Dep. at 24; Hamby Decl., ¶ 9.) Defendants disputes the notion that any evidence submitted supports an assertion regarding "standard industry practice."


62. In regards to the use of Confidential Information to solicit clients serviced by Eisenberg at De Witt, it was agreed that:

In consideration of Employee's continued employment with the company, Employee agrees that during the term of employment, and for the two (2) year period

70

immediately following termination of employment for any reason, Employee will not use Company's Confidential Information or Trade Secrets to solicit, accept, divert, or take away, in whole or in part, directly or indirectly, any clients or "prospect (as hereinafter defined) of Company who were solicited or serviced by Employee or by anyone directly or indirectly under Employee's supervision, or with whom Employee had any business relationship, within the two (2) year period immediately prior to Employee's termination of employment. For purposes of this Agreement, "Prospect" shall be defined as a potential customer known and contacted by Employee or Company prior to the date of termination of employment.

(Biging Decl., Ex. II, ¶ 5(c).)

63.     In or about October 2012, at the time he was negotiating the terms of his Employment Agreement with DeWitt, Eisenberg was unhappy with the compensation being discussed as part of the agreement. (Eisenberg Dep. at 120-123; Biging Decls., Exs. 9, 10, 16, 20, FF, LL, PP and Warshaw Decl., Ex. HH (together, "Kingman Dep."), at 96-99.)

64.     Plaintiff states that, in an effort to see if he could obtain greater compensation, Eisenberg met with Brian Kingman of AJG, to discuss the possibility of moving the book of business he had sold to Aon/AGRIS and DeWitt, to AJG, in exchange for a generous compensation package. (See Eisenberg Dep. at 120-123, 228; Biging Decls., Ex. D, UU, CCC, 1, 25, 33 (together, "Firestone Dep."), at 94, 102, 106.)

Defendants dispute the statement and note that Eisenberg did not sell his book of business to DeWitt. Defendants also note that Eisenberg and Brian Kingman had been friends for 20 years, and had always talked about doing some business together if it was feasibly possible, and that when it came time for Eisenberg to sign the 2012 Employment Agreement, he had been approached by other brokers to find out if he was available and if he was considering leaving DeWitt and wanted to know what his options were. (See Eisenberg Dep. at 121:2-18.)

65.    Eisenberg had known Kingman from his days at Great Northern, and working with him at Aon/AGRIS. (See Eisenberg Dep. at 82.)

66.    Plaintiff states that to try to get a better compensation package, Eisenberg brought a copy of the 2007 Employment Agreement with him to his meeting with AJG on October 8, 2012. (See Firestone Dep. at 94-95, 102-104, 106-107; Eisenberg Dep. at 120-121.) Defendants dispute this, noting that Eisenberg sent a copy of his Employment Agreement to AJG to see whether they felt he had a right to move, (see Eisenberg Tr. 121:2-18), did not negotiate with AJG until much later, (id. at 121:2-18). Eisenberg states that he left DeWitt because he felt

undercompensated, including due to DeWitt's commission arrangement with the Fireman's Fund, as detailed above.

67.  In discussing the possibility of moving to AJG, and taking with him the book of business he had sold to Dewitt, Eisenberg at no time discussed the possibility of moving the two employees DeWitt had hired to assist him in servicing the business with him to AJG. (See Kingman Dep. at 144-146; Firestone Dep. at 188-189; Eisenberg Dep. at 286-288, 343-344.)

68.  After several months of discussions regarding his compensation at AJG, Eisenberg agreed to move to AJG, and move the book of business he had sold to DeWitt to AJG so that the future commissions on insurance procured for the clients who made up this book of business would be generated for AJG. Defendants dispute that Eisenberg sold his book of business to DeWitt, as detailed above.

69.  According to Plaintiffs, while Eisenberg was still an employee of DeWitt, Eisenberg engaged in the following conduct: sending business opportunity information to Kingman; sending business opportunity information to his own personal e-mail address; working with Kingman to try to smooth the transition of a substantial new DeWitt client (New Regency) to AJG; working

with Kingman to solicit business for AJG from Guggenheim Partners; and sending a business opportunity to Coriena Baer of AJG. (See Biging Decl., Ex. DD, ¶ 34-38; id., Exs. KK, LL, NN, OO; Kingman Dep. at 180-181, 187-188, 191-192; Johnson Dep. at 41, 95-96, 115, 140; Eisenberg Dep. at 71, 306-312, 316-319, 344-346, 347.)

Defendants dispute this statement for reasons already stated. Defendants state that Eisenberg did not violate the non-solicitation provisions of his Employment Agreement, which does not prohibit Eisenberg from soliciting or doing business with any client he serviced at DeWitt so long as he did not use DeWitt's confidential information or trade secrets to do so. (See Defs.' 56.1 ¶ 21)  To Defendants, as detailed above, Eisenberg solicited clients at AJG based upon his long-standing relationships and without using any DeWitt confidential information, and had a pre-existing, long-standing relationship with Tom Prince at Weinstein, industry executive Tim Clawson at New Regency, and David Boyle. Defendants claim that Big Eyes was placed with DeWitt, meaning that DeWitt obtained all of the commissions relating to the insurance of this film, and AJG did not have any involvement in the placement of this film. (See Defs.' 56.1 ¶ 100.) They state that none of the information contained in the emails that Eisenberg forwarded to Kingman was

confidential information belonging to DeWitt, because Eisenberg could have obtained the same information for his contact at Weinstein. Defendants further note that Eisenberg and AJG have not solicited Guggenheim Partners to obtain business for AJG and have not done any brokerage business with Guggenheim Partners. (Id. ¶ 6).

70. Plaintiff states that New Regency was only first developed as an Eisenberg client while Eisenberg was employed at DeWitt. (See Eisenberg Dep. at 56-57, 71, 143, 222; Firestone Dep. at 125-126; Johnson Dep. at 41, 115, 140.) Defendants dispute this, stating that Eisenberg had a long relationship with Clawson and New Regency prior to his time at DeWitt, as detailed above.

71. According to Plaintiff, because of the relationships Eisenberg had developed over the years with these clients and the time he had been afforded to solicit business from and service these clients over the past six years as a result of DeWitt's legal and financial support, he was able to move almost all of the clients with him over to AJG. (See, e.g., Eisenberg Dep. at 143-174.) Defendants dispute this statement for reasons already discussed.

72. On April 30, 2013, Eisenberg contacted Johnson and requested a meeting be held on May 6, 2013 at DeWitt's corporate headquarters in New York. (Johnson Dep. at 90-91.)

73. Approximately 90 minutes before the meeting was scheduled to take place, Eisenberg cancelled the meeting, stating that his "travel plans got all screwed up." (Johnson Dep. at 92.)

74. Eisenberg subsequently requested that he be given the opportunity to speak with Johnson on May 6, 2013, when Johnson was scheduled to be back in the New York office after returning from a business trip that took him out of state. (Johnson Dep. Tr. at 93-94.) Defendants dispute that Eisenberg was aware that Johnson was out of town. (Eisenberg Dep. at 132:2-17.)

75. On May 6, 2013, Eisenberg gave notice of his resignation to Johnson over the telephone and stated his intention to immediately join and become employed by AJG. (See Eisenberg Dep. at 130; Johnson Dep. at 103.)

76. On that phone call, Eisenberg noted that his purpose was to earn a larger compensation package, stating: "I got to

leave - it's money - there's no way to live on the type of money I get from you." (Biging Decl., Ex. QQ.)

77.    Eisenberg then stated AJG was going to pay him a draw of $300,000 per year, or 30% more than he was receiving from DeWitt. (See Biging Decl., Ex. QQ.)

78.    According to Plaintiff, when advised during this phone call that he had a duty and obligation not to make use of the Company's confidential information or trade secrets to solicit any clients or prospects of the Company, Eisenberg disavowed any obligation to honor the commitments contained in his Employment Agreement. In response to the question put to him as to whether he would abide by the Employment Agreement's non-solicitation provision, he responded negatively. (See Biging Decl., Ex. QQ.)

Defendants dispute this statement and note that when Johnson asked Eisenberg whether he was willing to honor the two-year non-solicitation provision contained in the 2012 Employment Agreement, Eisenberg responded: "No. They're my accounts, I brought them in . . . . You didn't buy my accounts." (Def. 56.1 ¶ 24) and further explained he could not be precluded from doing business with the accounts that he brought to DeWitt based on his long-standing relationships. (Id.) Defendants further note

that Johnson did not state that DeWitt bought Eisenberg's book of business because it "[d]idn't come to mind" and he "wasn't thinking about that" nor tell Eisenberg that Eisenberg had no business to sell because he already sold it to Aon/AGRIS (Id.) Johnson did respond that DeWitt was going to sue Eisenberg. (Id.)

79.    Eisenberg was employed with DeWitt until May 6, 2013, when he resigned. (Biging Decl., Ex. EE, ¶ 9.)

80.    Eisenberg joined AJG as Area Executive Vice President on the day he resigned telephonically from DeWitt. (Biging Decl., Ex. C, ¶¶ 26-27.) With AJG, Eisenberg was responsible for producing film insurance business from clients and servicing that business. (Id.)

81.    While at AJG, Plaintiff states that Eisenberg actively solicited De Witt's clients, including the clients that had made up the book of business he had sold to DeWitt, by using DeWitt's confidential information as described in Eisenberg's employment agreements. (See Eisenberg Dep. at 70-71, 140-171.) For reasons detailed above, Defendants dispute this statement. (See Defs.' 56.1 ¶¶ 44-49.)

82. To Plaintiff, Eisenberg solicited the clients comprising the book of business he had sold to DeWitt by, among other means, asking them to send him what are known in the insurance brokerage industry as "broker of record" letters, which are necessary in order to receive the commissions on insurance purchased by the clients. (See Eisenberg Dep. at 59, 171.) Such solicitation covered almost all clients Eisenberg had ever worked with at GNBC, Aon/AGRIS, or DeWitt, to the extent they were still engaged in film and television production. (See Eisenberg Dep. at 70-71, 95, 140-74.) Defendants, for reasons stated above, dispute this statement.

83. Plaintiffs state that because of Eisenberg actions, they have lost the following clients: New Regency Productions, Inc.; Intersection Entertainment, LLC; The Wolf of Wall Street ("TWOWS"); Edward R. Pressman Film Corporation; The Weinstein Company; The Weinstein Company Holdings LLC; Twisted Pair Developments, LLC; Dino De Laurentiis Company DDLC, Martha DeLaurentis; Mosaic Media Group, Inc.; Project Allstars Inc.; Runway Productions Inc.; One Chance Films Ltd./First Chance Films; Survival Pictures; Carolyna De Laurentiis. (See Biging Decl., Exs. GG, TT; Hamby Dep. at 72-73.) Included among the clients that Dewitt lost to AJG as a result of Eisenberg's conduct are both client accounts that had been part of the

business sold to Aon/AGRIS in 2001 which had been successfully developed as DeWitt clients, and one client, New Regency, that DeWitt had only recently developed as a client based on its support of Eisenberg's efforts. (See Eisenberg Dep. Tr. at 228, 292-293; Johnson Dep. at 41, 115, 140; Biging Decl., Ex. TT.) Defendants dispute these statements for reasons already detailed above.

84. According to Plaintiff, Eisenberg denied having any intent to sell or actually selling his book of business to Aon/AGRIS, instead claiming he made an "arrangement with the buyer". (See Eisenberg Dep. at 21-23, 118.) Defendants dispute this, noting that Eisenberg sold Great Northern's assets Aon/AGRIS, but that he continued to work as a consultant for Aon/ARIS to maintain and service his book of business. (See Defs.' 56.1 ¶ 6.)

85. Plaintiff states that AJG knew or should have known that Eisenberg sold his book of business to DeWitt and had a non-solicitation provision in his Employment Agreement when they hired him. (See Biging Decl., Exs. UU, VV; Kingman Dep. at 79-80 Firestone Dep. at 94-100, 111-114; Eisenberg Dep. at 348-349.) Defendants dispute the statement and note that Eisenberg did not sell his book of business to DeWitt, and as there was no sale,

AJG was not aware of any such sale. (Kingman Dep. at 103:10-
104:9, 106:3-10.)

86. Plaintiff states that AJG made the decision to hire
Eisenberg and assist him in his efforts to move the book of
business he had sold to DeWitt to AJG after reviewing and having
its in house legal counsel prepare an analysis of the perceived
enforceability of the non-solicitation provisions of the
Employment Agreement. (See Biging Decl., Exs. WW, XX; Firestone
Dep. at 111, 115; Eisenberg Dep. at 348-349.) Defendants admit
that Eisenberg had AJG review his 2012 Employment Agreement to
assess its enforceability but dispute that Eisenberg sold his
book of business to DeWitt. (See Biging Decl., Ex. DD, at 121:2-
18; Defs.' 56.1 ¶¶ 16-17, 76-99.)

87. After he signed his 2012 Employment Agreement,
Eisenberg provided AJG with a copy of this agreement, and on May
7, 2013 AJG's General Counsel was sent a letter from DeWitt's
attorneys providing another copy, alerting him to the non-
solicitation provisions of the agreement, and demanding that no
actions be taken to solicit DeWitt clients in violation thereof.
(See Firestone Dep. at 94-95, 102-103; Eisenberg Dep. at 120-
121; Kingman Dep. at 157; Biging Decl., Ex. RR.)

88. Eisenberg requested and negotiated defense and indemnification language in connection with any lawsuits brought specifically by DeWitt in his contract with AJG. (See Biging Decl., Exs. YY, CCC; Kingman Dep. at 149; Firestone Dep. at 133-134, 155-158; Eisenberg Dep. at 284-286, 335-336.)

89. DeWitt continued to employ Born and Bond after Eisenberg left, attempting to find other work for them to do. (See Born Dep. at 95; Paige Dep. at 63-64; Hamby Dep. at 31.) Defendants dispute that Born had no accounts on which to work following Eisenberg's departure; Defendants point to Born's testimony that, after Eisenberg resigned, she handled some of Senior Managing Director Peter Marshall's accounts; some of Eisenberg's accounts that stayed after he left; she got new accounts; and a number of DeWitt employees were laid off when it was acquired by RSC, so she "got a lot of accounts from other people." (Born Dep. at 54:18-22.) Born also successfully solicited Weinstein to move its business back to DeWitt (See Defs.' 56.1 ¶ 67.)

90. During calendar year 2013, during which he worked at AJG from May 6, 2013 to December 31, 2013, Eisenberg was credited with generating total commissions on business he

brought to AJG or was otherwise deemed responsible for of
$300,532. (Biging Decl., Ex. CCC.)

91.    During calendar year 2014, during which he worked at
AJG the entire year, Eisenberg was credited with generating
total commissions on business he brought to AJG or was otherwise
deemed responsible for of $829,600. (Id.)

92.    Eisenberg concedes that the commission revenue he
generated for AJG in 2013 and 2014 was from clients he had
serviced at DeWitt, and which formed his "book of business" when
he joined DeWitt and throughout his employment with DeWitt. (See
Eisenberg Dep. at 143-174.)

93.    AJG prepared a chart detailing all of the commission
revenue generated for AJG for which Eisenberg was responsible
for producing, detailing the client, the premiums paid, and the
commissions earned and received. (See Biging Decl., Ex. EEE.)
Defendants dispute this statement because, for reasons already
noted, Defendants state that Eisenberg's accounts who
transferred their business to AJG did so because they viewed
Eisenberg as their insurance broker, not because Eisenberg sold
his book of business to DeWitt.

94. According to Plaintiff, Eisenberg claims that improper deductions were made to his commlsslons that resulted in an approximately 30% decrease in income because in calculating his commissions he was not given credit for additional compensation paid to DeWitt by the insurers apart from the premium commissions earned. (See Dkt. 61 ¶¶ 114-119; Eisenberg Dep. at 122-127, 204-206.) To DeWitt, Eisenberg further claims that these purported "unapproved deductions" were not part of what he negotiated when he first agreed to join DeWitt in 2007 and were a breach of his employment agreements. (Dkt. 61, ¶¶ 114-115.)

Defendants disputes this categorization. Defendants state that Eisenberg's income was reduced because DeWitt negotiated back-end deals with Fireman's Fund providing that DeWitt, but not Eisenberg, would receive supplemental income at the end of the year based, in part, upon business generated by Eisenberg and because this supplemental income was provided, Fireman's Fund was unwilling and unable to negotiate higher commission rates on an account-by-account basis relating to the business from Fireman's Fund for which Eisenberg did get credit. (Eisenberg Dep. at 111:7-16.) Defendants further state that by way of these back-end deals, Eisenberg lost commissions he would have received off the supplemental income if that supplemental

income was allotted to the funds paid to DeWitt on which
Eisenberg was eligible to receive commission. (Id. at 127:23.)

95.    Eisenberg has stated that an insurer would pay DeWitt
a commission of 17.5% of the premium it earned, and that he
would receive 30% of that 17.5% commission. (Eisenberg Dep. at
51, 122-127.)

96.    According to Plaintiff, in addition, the insurer would
pay DeWitt an additional 4% or 5% commission on the back end,
i.e., at the end of the year based on their production, and
Eisenberg believes he was entitled to 30% of that 4% commission.
(See Eisenberg Dep. at 122-127, 204-206.) Defendants dispute
this statement for reasons already detailed above.

97.    Each of Eisenberg's employment agreements with DeWitt,
by definition, explicitly exclude from his commission's
calculation any "additional compensation," "supplemental
compensation" or "guaranteed payments" by insurance carriers to
DeWitt. Specifically, the 2012 Employment Agreement excluded
from the term "Net Commission": "insurer expense payments,
profit sharing, supplemental compensation and guaranteed
payments paid to Company, commissions payable to sub-brokers."
(Biging Decl., Ex. II, Clause 3.) The 2007 Employment Agreement

excluded from the term "Net Base Commissions": "insurer expense payments, profit sharing, any other additional compensation paid to Employer by insurers, override payments." (Biging Decl., Ex. X at 6.)

Defendants dispute that Eisenberg claims he was entitled to receive a percentage of the supplemental income paid to DeWitt at the back-end of contracts with the Fireman's Fund and note that Eisenberg claims he could not negotiate higher commission rates with Fireman's Fund on the revenue on which he was entitled to a commission because of the supplemental income deal between DeWitt and Fireman's Fund. (See Defs.' 56.1 ¶ 101.)

98. Eisenberg's contractual agreements with DeWitt contain "merger" clauses which preclude any argument that Eisenberg negotiated other terms that should be considered part of those agreements. In particular, the 2007 Employment Contract provides that: "This letter agreement represents the entire agreement between you and DSG related to the subject matter herein and supersedes any negotiation, previous draft, agreements and otherwise, whether oral or written." (Biging Decl., Ex. X.) The 2012 Employment Agreement has a similar provision:

This Agreement and any Schedules attached constitute the entire understanding of the Parties with respect

86

to the subject matter hereof, and supersede all prior
and contemporaneous agreements, understandings,
promises and representations relating to the subject
matter hereof, written or otherwise. The provisions of
this Agreement supersede any conflicting provisions of
Company's Employee Handbook.

(Biging Decl., Ex. II.)


99. According to Plaintiff, Eisenberg does not dispute

that "net base commissions" was defined to exclude "insurer

expense payments, override payments, profit sharing or any other

additional compensation paid to employer by insurers."

(Eisenberg Dep. at 212.) Defendants note that Eisenberg further

testified that this supplemental income was not included in the

definition of what commission he was entitled to because "it's

not the norm for insurance brokers to receive a commission at

the end of the year . . . based on profitability. And they were

taking money out of my mouth." (Eisenberg Dep. at 212:15-19.)


100. Reference to such supplemental payments refers to

arrangements between DeWitt and some insurance carriers

concerning additional compensation to be paid to De Witt at the

end of a reporting period. (See Johnson Dep. at 106-110); Walker

Decl., ¶ 3.)

101. In connection with the receipt of supplemental compensation or profit sharing, usually there is an agreement with the carrier that sets forth the criteria for the compensation, as well as the potential percentage that might be paid, but the compensation is a moving target from year-to-year. (See Biging Decl., Ex. B, at 61-65; Johnson Dep. at 108-10.)

102. According to Plaintiff, Eisenberg was put on notice about this additional compensation received by DeWitt in his 2007 Employment Agreement, his 2012 Employment Agreement, and in emails from people at DeWitt which disclosed such compensation in the signature boxes. For example, on October 8, 2007, Eisenberg received an email from Paige whose signature box contained the following:

DeWitt Stern is compensated through fees and/or commissions for services provided to clients to identify, value, mitigate, transfer and administer their risks. In addition to this compensation, DeWitt Stern has agreements with most of its insurance markets through which it is compensated for insurance placed in these insurance markets. These payments are based upon such factors as the overall volume, growth, and profitability of the total premium placed with each insurer. DeWitt Stern provides additional information about its compensation practices at the request of a client.

(Eisenberg Dep. at 248.) Defendants dispute this statement and note that Eisenberg testified that when he signed his employment

agreements with DeWitt, he was not made aware of any arrangement with Fireman's Fund and only learned about it through discussion with someone from Fireman's Fund when he was trying to negotiate higher commissions rates. (See Eisenberg Dep. at 122:7-24, 123:9-12, 204:17-206:12.)

103.    Eisenberg acknowledged that he had no actual knowledge of how the Fireman's Fund back-end commissions were calculated or whether they were pursuant to a written agreement. (Eisenberg Dep. at 214.)

104.    Eisenberg's contracts contained a provision stating that his compensation excluded such additional compensation. Furthermore, individual producers at DeWitt do not typically get any income relating to this additional compensation. (See Biging Decl., Ex. B at 63-65; Johnson Dep. at 107; Walker Decl., ¶¶ 4-5.)

105.    In many of the years Eisenberg was at DeWitt, his draw exceeded his commission entitlement, resulting in Eisenberg being paid $227,000 more than he actually earned. (See Walker Decl., ¶ 6; Biging Decl., Ex. B at 61.)

106.    Despite the fact that he was being paid substantially
more than he actually earned, DeWitt did not attempt to make any
chargebacks to Eisenberg relative to these deficits, although
DeWitt could have done so under the terms of Eisenberg's
agreements. (See Walker Decl., ¶ 6.)

### 3. The Facts as Relevant to Eisenberg's Counterclaims

The facts as set forth above in connection with Plaintiff
and Defendants' motions for summary judgment as to the SAC were
deemed by the parties as applicable also to DeWitt's motion for
summary judgment dismissing Eisenberg's counterclaims.

## Applicable Standard

Summary judgment is appropriate only where "there is no
genuine issue as to any material fact and ... the moving party
is entitled to a judgment as a matter of law." Fed. R. Civ. P.
56(c). A dispute is "genuine" if "the evidence is such that a
reasonable jury could return a verdict for the nonmoving party."
Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The
relevant inquiry on application for summary judgment is "whether
the evidence presents a sufficient disagreement to require
submission to a jury or whether it is so one-sided that one

party must prevail as a matter of law." Id. at 251-52. A court
is not charged with weighing the evidence and determining its
truth, but with determining whether there is a genuine issue for
trial. Westinghouse Elec. Corp. v. N.Y. City Transit Auth., 735
F. Supp. 1205, 1212 (S.D.N.Y. 1990) (quoting Anderson, 477 U.S.
at 249). "[T]he mere existence of some alleged factual dispute
between the parties will not defeat an otherwise properly
supported motion for summary judgment; the requirement is that
there be no genuine issue of material fact." Anderson, 477 U.S.
at 247-48 (emphasis in original).

On cross-motions for summary judgment "neither side is
barred from asserting that there are issues of fact, sufficient
to prevent the entry of judgment, as a matter of law, against it
. . . . [A] district court is not required to grant judgment as
a matter of law for one side or the other." Heublein, Inc. v.
United States, 996 F.2d 1455, 1461 (2d Cir. 1993).

**Issues Presented**

This action, initiated in 2013, has gone through a number
of iterations as set forth above. Discovery has been completed
and both sides now seek summary judgment. The initial question
presented is whether or not, despite widely divergent position,

the parties have established sufficient undisputed facts to permit a summary judgment determination.

DeWitt's principal position is that it possessed Eisenberg's book of business in May 2013 when Eisenberg resigned from DeWitt to begin work at AJG, a competitor. If so, Eisenberg misappropriated confidential information from DeWitt in violation of the 2012 Employment Agreement. Defendants contend that the undisputed facts fail to establish these claims.

Although the separation of undisputed fact from disputed legal theory is not always easily identified, a review of the characteristics of the industry and the history of the relationship between the parties, including the conduct of this litigation, as set forth above, establish that summary judgment, as set forth below, is appropriate.

## **Defendants' Motion for Summary Judgment for the SAC is Granted and Plaintiff's Motion for Summary Judgment for the SAC is Denied**

Both Plaintiff and Defendants have moved for summary judgment on the SAC. For the following reasons, Defendants' motion for summary judgment is granted and Plaintiff's motion for summary judgment is denied.

1. Breach of Contract (Count II) and Tortious
   Interference with and Contractual Relationships (Count
   VII)

DeWitt has alleged claims for breach of contract against

Eisenberg (Count II) and tortious interference with contractual

relations against AJG (Count VII). To meet its burden as to the

breach of contract claim, DeWitt must prove (1) there was an

agreement; (2) adequate performance of the contract by the

plaintiff; (3) breach of the contract by the defendant; and (4)

damages. 24/7 Records, Inc. v. Sony Music Entm't, Inc., 429 F.3d

39, 42 (2d Cir. 2005) (citation omitted). To prove its

interference with contractual relationships claim, DeWitt must

show "the existence of a valid contract between plaintiff and a

third party, the defendant's intentional and unjustified

procurement of the third party's breach of the contract, the

actual breach of the contract, and the resulting damages." Katel

Liab. Co. v. AT&T Corp., 607 F.3d 60, 66 (2d Cir. 2010) (quoting

Jim Ball Chrysler LLC v. Marong Chrysler-Plymouth, Inc., 19

A.D.3d 1094, 796 N.Y.S.2d 804, 805 (4th Dep't 2005)) (internal

alternations omitted).

To resolve this issue requires determining the parameters

of the 2007 Employment Agreement, whether the 2007 or 2012

Employment Agreement is operative, and whether Eisenberg

breached the operative contract's provisions. For the reasons
below, the facts do not establish DeWitt's two claims.

### a. The Facts Do Not Establish That DeWitt Purchased Eisenberg's Book of Business in the 2007 Employment Agreement

A threshold matter is the question of whether it can be
shown that DeWitt purchased Eisenberg's book of business. DeWitt
contends that under the 2007 Employment Agreement it purchased
Eisenberg's book of business after it settled the Aon/AGRIS
lawsuit and entered into the 2007 Employment Agreement with
Eisenberg.[2] Eisenberg has held that he sold his book of business
and Great Northern-associated goodwill to Aon/AGRIS, for which
he received $400,000 in proceeds, but has denied selling his
book of business to DeWitt. A review of the facts cannot
establish DeWitt's position.

In support of its view, DeWitt has repeatedly pointed to
the introductory paragraph of the 2007 Employment Agreement,
which states: "We are pleased to offer you the following terms
in connection with your employment by the firm as a Director and

---

[2]     This Court has previously held that even if the employment
agreements are found to be a contract for a sale, a non-
contractually based claim could still survive if "discovery
yield[ed] evidence [that] DeWitt purchased Eisenberg's book of
business extraneously to and independently of the [2012]
Employment Agreement." (Dkt. 57 at 14.) As discussed below,
however, the evidence fails to establish this.

officer of our company and the purchase of your present and future book of business . . . ." (Warshaw Decl., Exs. R, S.) DeWitt contends that the placement of this statement in the introductory paragraph is immaterial to it being an essential component of the contract. (See Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. at 24-25; Pl.'s 56.1 ¶¶ 23, 25-29, 31, 39.)

The 2007 Employment Agreement read as a whole, however, does not constitute a purchase of Eisenberg's book of business. The 2007 Employment Agreement does not contain any terms or details concerning a purchase for a book of business; the contractual clauses only relate to Eisenberg's employment with DeWitt.[3] Furthermore, the 2007 Employment Agreement does not make reference to the names of any clients or accounts which DeWitt claims to have purchased.

At most, the noted sentence suggests that the agreement is ambiguous, which requires that the Court consider parole evidence. Law Debenture Trust Co. of N.Y. v. Maverick Tube Corp., 595 F.3d 458, 465 (2d Cir. 2010). Then, "if the parole

---

[3]     To the extent that the parties appear generally to use the term "book of business" to refer, in the context of entertainment insurance, to a person's relationships with key people at television and film production studios, no such definition—and, furthermore, no definition at all—exists in any of Eisenberg's contracts with DeWitt.

95

evidence offered by the parties does not resolve that ambiguity
. . . the Court must construe the contract as a matter of law on
a summary judgment motion." Bank of Taiwan N.Y. Agency v.
Granite State Ins. Co., No. 03 Civ. 0682 (DAB) (AJP), 2003 WL
21540664, at *7 (S.D.N.Y. July 9, 2003) (collecting cases).
"[I]t is the Court's role to determine the value or existence of
extrinsic evidence produced by the parties." Aviation Dev. Co.
PLC v. C&S Acquisition Corp., No. 97 Civ. 9302 (AJP), 1999 WL
46630, at *9 (S.D.N.Y. Feb. 2, 1999) (citing Uniroyal, Inc. v.
Home Ins. Co., 707 F. Supp. 1368, 1375 (E.D.N.Y. 1988)).


    The relevant parole evidence is as follows. DeWitt has
noted a 2007 email from Paige to Eisenberg prior to the
agreement's signing in which Paige wrote that, "I had restored
the language making clear that this agreement involves the
purchase of your business. As discussed, this is an essential
element of the agreement." (Pl.'s 56.1 ¶ 27.) Second, DeWitt
points to an internal business planning document where Paige
characterized the $90,000 bonus to Eisenberg as a "Purchase of
book" and "Fee to Richard Eisenberg for purchase of book of
business." (Pl.'s 56.1 ¶ 33.) However, at best, these documents
only evidence Paige's subjective belief, not that they were ever
shared with Eisenberg or that Eisenberg understood and agreed
that he had sold anything to DeWitt when he agreed to work

96

there. These pieces of evidence do not establish the actualization of a sale between the parties.

The additionally provided parole evidence provides little more to aid in resolving the ambiguity. The negotiations over the 2007 Employment Agreement included one party, Eisenberg, who vehemently denies ever selling his book of business to DeWitt. (See, e.g., Def. 56.1 ¶ 76 ("Well, if I wasn't paid for it, why would I sell it?"; "I wasn't paid for my book of business.").) The other party, Paige, has stated he has no memory or belief as to what he meant when he included the language that DeWitt now cites. (See Paige Dep. 44-45.) Johnson, on whose testimony DeWitt often relies in its motion papers, has stated that he was not involved in any of the employment negotiations with Eisenberg, had no recollection of what the \$90,000 payment was for, and did not discuss purchasing Eisenberg's business. (See Defs.' 56.1 ¶ 81, 85, 92.) Stern's testimony is similarly unclarifying on the point. In sum, this evidence does not present a reasonable alternative view on the 2007 Employment Agreement's provisions.

DeWitt also argues that it purchased Eisenberg's book of business by settling the lawsuit filed by Aon/AGRIS. Whether DeWitt subjectively thought so, the evidence does not support

that contention. The Settlement Agreement speaks unambiguously as to the intents of the parties and remains "[t]he best evidence of what parties to a written agreement intend[ed]." Greenfield v. Philles Records, Inc., 98 N.Y.2d 562, 569 (2002) (citations and quotation marks omitted). This Court has already observed that the Settlement Agreement on its face "neither . . . state[s] or even refer[s] to an explicit agreement whereby DeWitt would exclusively own Eisenberg's clients." (Dkt. 39 at 17-18.) Rather, the Settlement Agreement states that "DeWitt purchased a 'compromise' amongst the parties that 'will never be construed as an admission by any of the Parties of any liability, wrongdoing or responsibility.' The Employment Agreement does not make any reference to DeWitt owning Eisenberg's 'book of business' or his clients." (Id.)

Moreover, at his deposition, Paige recalled no discussions at DeWitt relating to the enforceability of Eisenberg's restrictive covenants with Aon/AGRIS, that it might be an issue for Eisenberg to solicit the business he had worked on at Aon/AGRIS, or discussing either topic with Eisenberg. (See Defs.' Counter 56.1 ¶ 35.) Paige had no recollection about the Aon/AGRIS lawsuit, who filed it, whose idea it was to file it, or what Aon/AGRIS's claims were. (Id.) Accordingly, the Settlement Agreement provides no support in either direction as

to how to evaluate the 2007 Employment Agreement and, at

minimum, cannot be used to demonstrate the purchase of any sort.[4]

Taken together, evaluating this evidence is not a question

of credibility but of value. It is therefore proper for the

Court to construe the contract. See State v. Home Indem. Co., 66

N.Y.2d 669, 672, 486 N.E.2d 827, 829 (1985) ("Thus, because

there are no questions of credibility and no inferences to be

---

[4]   DeWitt's argument as to the language of the 2007 Employment
Agreement is also contradicted by DeWitt's prior pleadings as to
the nature of the Settlement Agreement, which repeatedly argued
that DeWitt did not actually purchase a book of business, but
rather "effectively" purchased it from Aon/AGRIS under the terms
of the Settlement Agreement.

For example, in DeWitt's brief in support of its original
application for injunctive relief, DeWitt argued that the 2007
Employment Agreement was an agreement relating to Eisenberg's
employment: "In order to memorialize and confirm the
understandings and agreements entered into between DeWitt and
Eisenberg with respect to his employment for the Company . . . ,
DeWitt had Eisenberg sign a series of employment agreements with
the Company [including the 2007 Employment Agreement]." (Warshaw
Decl., Ex. U.) Furthermore, in motion papers submitted in
support of its denied motion for sanctions, DeWitt took the
position that it could have never purchased Eisenberg's book of
business because he had already sold it to Aon/AGRIS and thus he
had nothing to sell. There, DeWitt stated:

> Nowhere in DeWitt's papers in support of either motion
> [for injunctive relief or sanctions] does DeWitt ever
> argue that it purchased Eisenberg's book of business
> from him. In fact, quite the contrary, it is DeWitt's
> argument that when he came to be employed by DeWitt,
> Eisenberg no longer had a book of business to sell.

(Dkt. 33 at 8.) These statements run notably counter to
some of DeWitt's positions today.

drawn from extrinsic evidence, the interpretation of the

[contract] is an issue of law which can be decided by this

court."). With no clarifying extrinsic evidence, and when viewed

in "context of the entire integrated agreement," the

introductory portion of the 2007 Employment Agreement could not

be found by a reasonable juror to constitute a sale of

Eisenberg's book of business. Walk-In Med. Ctrs., Inc. v. Breuer

Capital Corp., 818 F.2d 260, 263 (2d Cir. 1987). The 2007

Employment Agreement therefore is to be read as an employment

contract and not a purchase agreement over Eisenberg's book of

business.[5]

---

[5]    As the 2007 Employment Agreement cannot reasonably be
construed as a purchase of Eisenberg's book of business, the
portions of the motion briefing dedicated to Mohawk Maint. Co.
v. Kessler are unnecessary, as detailed below. 74 A.D.2d 511,
512 (1st Dep't 1980).

    The Mohawk doctrine is grounded in New York common law and
creates implied restrictive covenants in the context of
purchasing another's businesses. Id. Under Mohawk, an implied
covenant not to solicit business is "based on a seller of
goodwill's permanent implied covenant or duty to refrain from
soliciting former customers, which arises upon the sale of the
'good will' of an established business." Ritani, LLC v.
Aghjayan, 880 F. Supp. 2d 425, 452 (S.D.N.Y. 2012) (quoting
Bessemer Trust Co. v. Branin, 16 N.Y.3d 549, 556 (2011)). The
Mohawk doctrine applies when a defendant has sold an
"established business" to a plaintiff, because courts have held
it is "not an honest thing to pocket the price and then to
recapture the subject of sale." Bessemer Trust Co., 16 N.Y.3d at
556 (citations omitted); see Mar-Cone Appliance Parts Co. v.
Mangan, No. 10 Civ. 999A(F), 2012 WL 5906874, at *1 (W.D.N.Y.
Nov. 7, 2012) (noting that the Mohawk doctrine prohibits "a
voluntary selling owner of a business from soliciting its former
customers). Had Eisenberg sold his book of business, DeWitt

b. The 2012 Employment Agreement Supersedes the Rest of the 2007 Employment Agreement

The next matter is which contract between DeWitt and Eisenberg is the operative contract. Defendants argue that the 2012 Employment Agreement supersedes the 2007 Employment Agreement under the 2012 integration clause and is therefore the only enforceable contract at issue. In response, DeWitt contends that the 2012 Employment Agreement's integration clause does not render the 2007 Employment Agreement unenforceable because the clause does not relate to the same subject matter. (Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. at 22-24.)

"Generally, under New York law, a subsequent contract regarding the same subject matter supersedes the prior contract." CreditSights Inc. v. Ciasullo, No. 05 Civ. 9345 (DAB), 2007 WL 943352, at *6 (S.D.N.Y. March 29, 2007) (internal

claims, it would be entitled to protections against Eisenberg's solicitation of those clients under Mohawk.

As already set forth, DeWitt has not presented evidence to establish that DeWitt and Eisenberg ever negotiated and agreed that DeWitt would purchase Eisenberg's book of business. Because the 2007 Employment Agreement did not constitute a sale of Eisenberg's book of business to DeWitt, and Mohawk applies only following a sale of a business, the doctrine is inapposite. See Bessemer Trust Co. v. Branin, 618 F.3d 76, 85-86 (2d Cir. 2010) ("The Mohawk doctrine . . . recognizes as part of the common law of New York a 'so-called "implied covenant" by a seller to refrain from soliciting former customers following the sale of the 'good will' of a business.'" (quoting Mohawk, 52 N.Y.2d at 284)).

quotation marks and citations omitted). To the extent there is uncertainty as to whether the terms are on the same subject matter, a subsequent contract "will not supersede an earlier contract unless the subsequent contract has definitive language indicating it revokes, cancels or supersedes that specific prior contract." Id. (quoting Globe Food Servs. Corp. v. Consol. Edison Co. of N.Y., Inc., 184 A.D.2d 278, 279-80, 584 N.Y.S.2d 820, 821 (1st Dep't 1992)). When determining if a particular provision is superseded by a provision in a subsequent contract, courts look to "(1) whether there is an integration and merger clause that explicitly indicates that the prior provision is superseded; (2) whether the two provisions have the same general purpose or address the same general rights; and (3) whether the two provisions can coexist or work in tandem." Long Side Ventures, LLC v. Adarna Energy Corp., No. 12 Civ. 6836 (LTS) (MHD), 2014 WL 4746026, at *6 (S.D.N.Y. Sept. 24, 2014) (quoting A&E Television Networks, LLC v. Pivot Point Entm't, LLC, No. 10 Civ. 09422 (AJN), 2013 WL 1245453, at *1 (S.D.N.Y. Mar. 27, 2013)).

Each of these requirements is present here. The terms and subject matter of the 2007 and 2012 Employment Agreements are address the same topic, Eisenberg's employment conditions while at DeWitt, and the agreements contain the same subjects, like

102

compensation, termination, and indemnification. (Compare Warshaw
Decl., Exs. R & S, with id., Ex. T.) The 2007 Employment
Agreement was a five-year agreement that expired in 2012 and the
compensation details between the two agreements are different,
eliminating the ability for the two to coexist and operate in
tandem. And as already noted, the 2012 Employment Agreement
contains an integration clause that expressly notes that the
agreement supersedes all agreements "with respect to the subject
matter hereof" – namely, by its own agreement title, Eisenberg's
employment. (Warshaw Decl., Ex. T at 7.) The 2012 Employment
Agreement controls. See Private One of N.Y., LLC v. JMRL Sales &
Serv., Inc., 471 F. Supp. 2d 216, 223 (E.D.N.Y. 2007) ("Since
this "separate second agreement" addressed the same subject
matter as Agreement One, it superseded Agreement One."). As
such, the 2012 Employment Agreement is the operative agreement.

There is no material dispute that the 2012 Employment
Agreement only prohibits Eisenberg from soliciting or doing
business with clients he serviced at DeWitt for up to two years
if, in doing so, he used DeWitt's confidential information or
trade secrets to do so. (See Pl.'s 56.1 ¶¶ 59-60; Defs.' Counter
56.1 ¶¶ 59-60; Defs.' 56.1 ¶ 60.) The Court has also already
concluded the same. (Dkt. 12 at 8.) Thus, under the provisions
of the 2012 Employment Agreement, the only contractual

strictures upon Eisenberg are that he may not misappropriate
confidential information or trade secrets belonging to DeWitt
and use such to solicit clients.

### c. DeWitt Has Not Established Eisenberg Used Protected Confidential Information in Breach of the 2012 Employment Agreement

Plaintiff contends that Eisenberg breached the 2012
Employment Agreement by misappropriated confidential and trade
secret information protected from use under the terms of the
agreement. This claim fails because, ultimately, DeWitt fails to
identify any legally protected confidential information or trade
secret it owns that Eisenberg used.

The principal confidential information or trade secret
DeWitt identifies relate to information regarding clients and
accounts. Here, the evidence submitted establishes that
entertainment insurance account information such as policy
information, expiration dates, terms and conditions, and pricing
all belong to clients, not brokers, and that such information
can be shared by clients with competing brokers. Evidence has
also been submitted that the identities of individuals who make
the decisions about purchasing insurance in the entertainment
industry are known throughout the industry, are not a secret,
and may be easily found through simple searches. Furthermore, as

this Court has already found, such information is not protected
confidential information: "As a matter of law, Eisenberg's own
recollection of his customers or pre-existing relationships
cannot constitute confidential information. Nothing about the
names or identities of accounts or clients, nor the contacts at
those accounts, is confidential or a trade secret belonging to
DeWitt." (Dkt. 39 at 16) (citations omitted). DeWitt may only
protect information that "was not readily available through
other sources." Pure Power Boot Camp, Inc. v. Warrior Fitness
Boot Camp, LLC, 813 F. Supp. 2d 489, 510 (S.D.N.Y. 2011).

Even assuming DeWitt had established that any client
information is legally protected confidential information or a
trade secret, no reasonable jury could conclude that Defendants
misused any such information or trade secret to solicit clients.
This Court has already been held in this action that Eisenberg
cannot be prevented from "soliciting clients with whom he had
pre-existing relationships, or using information based on casual
memory." (Dkt. 57 at 11-12) (citing Barbagallo v. Marcum LLP,
820 F. Supp. 2d 275, 296 (E.D.N.Y. 2013); Nebraskaland, Inc. v.
Brody, No. 09 Civ. 9155 (DAB), 2010 WL 157496, at *3 (S.D.N.Y.
Jan. 13, 2010); Good Energy, L.P. v. Kosachuk, 49 A.D.3d 331,
332 (1st Dep't 2008)). It is not a violation of the 2012
Employment Agreement to "approach[] clients whose names and

105

identities [Eisenberg] knew prior to joining DeWitt, and which are readily accessible to the public." (Dkt. 39 at 17.)[6]

DeWitt identifies several pieces of evidence, none of which reasonably establish use of protected information. First, DeWitt points to a series of emails Eisenberg sent to himself and Kingman leading up to Eisenberg's resignation from DeWitt. However, it is not a violation of the 2012 Employment Agreement for Eisenberg to "make preparations to compete with his employer while still working [there]." Pure Power Boot Camp, 813 F. Supp. 2d at 521. Pointing to the same emails, DeWitt notes that Eisenberg and Kingman discussed several clients and client projects, (see Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. at

_____

6    For similar reasons, Plaintiff's argument that Eisenberg violated the 2012 Employment Agreement's non-solicitation provisions also cannot be established. (See Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 18-20.) DeWitt argues that, under New York law, it is entitled to an enforceable interest in client relationships and goodwill when it has "contributed financially to the creation, development and maintenance of those relationships and goodwill. (Id. at 18 (citing BDO Seidman v. Hirshberg, 93 N.Y.2d 382, 392, 712 N.E.2s 1220, 1225, 690 N.Y.S.2d 854, 859 (1999)). However, unlike in BDO Seidman and other cases cited by Plaintiff, such a protection is only available when the employee gained clients at an employer that were not previously the employee's. See, e.g., FTI Consulting, Inc. v. Graves, No. 05 Civ. 6719 (NRB), 2007 WL 2192200, at *8 (S.D.N.Y. July 31, 2007) ("[H]owever, FTI cannot extend the covenant to FTI clients with whom Graves did not develop a relationship during the course of his employment with FTI."). No evidence has been submitted that the clients solicited by Eisenberg were not clients with whom he already possessed a substantive professional relationships, falling outside the noted sphere of protection.

106

34-35), but the same underlying issue is present: no evidence has been presented that information used by Eisenberg was confidential information independent of what he already knew and could have permissibly obtained from those clients.

DeWitt's argument that its account contacts and account characteristic information is protectable is similarly unavailing. DeWitt points to the testimony of Hamby, who stated that in the industry, information like a client's risk tolerance, coverage preferences, and other particulars could be categorized as confidential information under the 2012 Employment Agreement. (See Pl.'s Mem. in Opp. to Defs.' Mot. for Summ. J. at 28-29.) However, no evidence has been presented to show any specific "account contact" or "account characteristic" that Eisenberg misappropriated and used to solicit DeWitt's accounts. To the contrary, Hamby's testimony provided evidence reasonably points the other way with regard to Eisenberg's actions:

Q: Mr. Hamby, regarding the five clients that you listed [as being improperly taken by Eisenberg], do you believe that Mr. Eisenberg used any confidential DeWitt information to solicit business from those customers?

A: Well, he used his relationships. His relationships with these clients, you know, if that is considered confidential in the contract he signed with DeWitt, then yes, he used confidential information.

Q: Aside from that, any other DeWitt confidential information that you believe he sued to solicit these clients?

A: I'm not aware that he took any materials of anything of that sort, if that's what you're asking.

(Hamby Dep. at 75:21-76:15.) Evidence put forward from DeWitt employees similarly establish that Eisenberg simply relied upon his long-standing personal relationships with clients to convince them to move their business to AJG. Both Hamby and Born testified that the sole reason that clients moved from DeWitt to AJG was because of Eisenberg's personal and long-standing relationships with major decision-makers at those client companies. (See Defs.' 56.1 ¶¶ 47, 63.)

DeWitt has neither identified any contrary evidence to this view nor authorities that demonstrate that reliance on prior relationships constitutes confidential information. As such, no reasonable juror could find anything but that Eisenberg ultimately took business from DeWitt, but not by taking confidential information or trade secrets from it. This did not breach the 2012 Employment Agreement; absent a breach, it thereby follows there could be no tortious interference of the contract by AJG.

Accordingly, Defendants' motion for summary judgment dismissing Counts II and VII is granted.

## 2. Misappropriation of Confidential Information (Count III)

DeWitt alleges a claim for misappropriation of confidential information against Defendants (Count III). To state such a claim, a plaintiff must show "that the defendant used the plaintiff's confidential information for the purpose of securing a competitive advantage." Reed Const. Data Inc. v. McGraw-Hill Cos., Inc., 745 F. Supp. 2d 343, 352 (S.D.N.Y. 2010) (citations omitted). "Where the plaintiff and defendant are both parties to a contract, the plaintiff must allege a breach of a duty independent of the duties under the contract." Id. (quoting Carvel Corp. v. Noonan, 350 F.3d 6, 16 (2d Cir. 2003) (internal alterations and quotation marks omitted). "In such a case, the focus is on whether a noncontractual duty was violated; a duty imposed on individuals as a matter of social policy, as opposed to those imposed consensually as a matter of contractual agreement." Id. at 353 (internal quotation marks and citations omitted).

Defendants argue that DeWitt's claim for misappropriation of confidential information and trade secrets must fail because

109

provisions regarding the claim are already included in the
operative 2012 Employment Agreement. See Productivity Software
Int'l, Inc. v. Healthcare Techs., Inc., No. 93 Civ. 6949 (RPP)
1995 WL 437526, at *8 (S.D.N.Y. Jul. 25, 1995) (misappropriation
claim "must spring from circumstances extraneous to, and not
constituting elements of, the contract"). This is correct:
DeWitt's claim duplicates the same allegations of
misappropriation of confidential information and trade secrets
as under its contractual claims. (Compare Dkt. 60, ¶¶ 66-68,
with id., ¶¶ 69-74.) The claim therefore cannot be established
on those grounds.

Insofar as DeWitt also argues misappropriation of
confidential information or trade secrets as the basis for its
other quasi-contractual and common-law claims, (see Pl.'s Mem.
in Opp. to Defs.' Mot. for Summ. J. at 38), such a claim also
cannot survive. As this Court has already found, "[t]here is no
dispute that 'the existence of a valid and enforceable written
contract governing a particular subject matter ordinarily
precludes recovery in quasi contract for events arising out of
the same subject matter.'" (Dkt. 57 at 9) (quoting Clark-
Fitzpatrick, Inc. v. Long Island R.R. Co., 70 N.Y.2d 382, 388
(1987)). The 2012 Employment Agreement covers these same subject
matters, precluding the claim.

Lastly, even if it were concluded *arguendo* that Plaintiff's common-law claims do not overlap with portions of the 2012 Employment Agreement, for the reasons discussed above—namely, that Eisenberg did not take information from DeWitt that he would otherwise not have possessed and thereby provided him an "unfair competitive advantage"—DeWitt's misappropriation claim would still fail. Ecolab Inc. v. Paolo, 753 F. Supp. 1100, 1111 (E.D.N.Y. 1991) (quoting Greenwich Mills Co., Inc. v. Barrie House Coffee Co., Inc., 91 A.D.2d 398, 405, 459 N.Y.S.2d 454, 459 (2d Dep't 1983)).

Accordingly, Defendants' motion for summary judgment dismissing Count III is granted.

## 3.   Breach of Fiduciary Duty and Duty of Loyalty (Counts IV and V)

DeWitt has alleged that by engaging in pre-termination communications with DeWitt competitors, Eisenberg breached his fiduciary duty (Count IV) and duty of loyalty (Count V) to DeWitt. In support of its claims, DeWitt argues that Eisenberg breached its duties by discussing DeWitt's confidential client information with AJG as well as diverting particular DeWitt clients and client prospects to AJG while Eisenberg was still

employed at DeWitt. (See Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 27-29.)

"A breach of fiduciary duty, and generally in tandem, of loyalty, occurs when a fiduciary commits an unfair, fraudulent, or wrongful act, including misappropriation of trade secrets, misuse of confidential information, solicitation of employer's customers before cessation of employment, conspiracy to bring about mass resignation of an employer's key employees, or usurpation of the employer's business opportunity." Poller v. BioScrip, Inc., 974 F. Supp. 2d 204, 227 (S.D.N.Y. 2013) (internal quotation marks and citation omitted). "[T]hese duties are not dependent upon an express contractual relationship, but exists even where the employment relationship is at-will." Id. at 227-28 (internal quotation marks omitted) (quoting Pure Power Boot Camp, 813 F.Supp.2d at 521). To state claims under either action, a plaintiff must show the existence of a fiduciary duty, a knowing breach of that duty, and damages resulting from the breach. See Johnson v. Nextel Commc'ns, 660 F.3d 131, 138 (2d Cir. 2011).

These claims cannot be established. First, as set forth above, the facts establish that Eisenberg did not use any protected confidential information in the emails that he

forwarded to himself and to Kingman to solicit DeWitt's clients because Eisenberg could have obtained the same information directly from the clients. The facts do not establish that Eisenberg usurped any client business opportunities for AJG that would otherwise have gone to DeWitt. Furthermore, DeWitt has not proved that it suffered any damages due to Eisenberg's alleged improper actions, which were cured at the outset of this litigation. As this Court has previously noted:

> [A]fter the [June 4, 2013 temporary restraining order,] Eisenberg discovered that his personal email account still contained emails he sent and received in furtherance of his work at DeWitt, and immediately worked with counsel to delete these emails or return them to DeWitt as required by the order. The violation of the June 4 Order and the Employment Agreement with respect to the confidential data has thus been effectively resolved.

(Dkt. 39 at 20) (citation omitted). As Eisenberg did not compete with DeWitt at DeWitt's expense or use its "resources, time, facilities, or confidential information," the emails put forward by Plaintiff as evidence of breach are only "preparations to compete with his employer while still working for the employer," not a violation of Eisenberg's fiduciary duties to DeWitt. Pure Power, 813 F. Supp. 2d at 521.


Accordingly, Defendants' motion for summary judgment dismissing Counts IV and V is granted.

4. Unfair Competition (Count IX)

DeWitt alleges the tort of unfair competition against
Eisenberg, using the same arguments that ungird its arguments
for the misappropriation of confidential information. (See Pl.'s
Mem. in Supp. of Pl.'s Mot. for Summ. J. at 34.) "The essence of
an unfair competition claim under New York law is that the
defendant has misappropriated the labors and expenditures of
another." Saratoga Vichy Spring Co. v. Lehman, 625 F.2d 1037,
1044 (2d Cir. 1980) (citations omitted). "Courts have described
unfair competition as 'misappropriat[ing] for the commercial
advantage of one person . . . a benefit or property' right
belonging to another." Berman v. Sugo LLC, 580 F. Supp. 2d 191,
209 (S.D.N.Y. 2008) (quoting Roy Exp. Co. Establishment of
Vaduz, Liechtenstein v. Columbia Broad. Sys., Inc., 672 F.2d
1095, 1105 (2d Cir. 1982)).

As discussed above, because the facts have not established
that Eisenberg used information not otherwise available to him,
this claim cannot survive. Accordingly, Defendants' motion for
summary judgment dismissing Count IX is granted.

## 5. Tortious Interference with Business (Count X)

DeWitt has alleged a claim for intentional interference with a business relationship against Defendants (Count X). DeWitt grounds support of this claim on the same arguments already stated above with regard to Eisenberg's contractual and fiduciary obligations to DeWitt and AJG's involvement with Eisenberg on the eve of Eisenberg's departure from AJG. (See Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 35.)

Under New York law, to state a claim for tortious interference with prospective economic advantage requires showing "(1) a business relationship with a third party; (2) the defendant's knowledge and intentional interference with that relationship; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) injury to the business relationship." Restis v. Am. Coalition Against Nuclear Iran, Inc., 53 F. Supp. 3d 705, 725 (S.D.N.Y. 2014) (citing Kirch v. Liberty Media Corp., 449 F.3d 388, 400 (2d Cir. 2006).

As set forth above, DeWitt is precluded from pursuing common law claims to the extent they overlaps with claims being brought that are grounded in its contractual agreement. Moreover, DeWitt has failed to present any evidence that

Defendants acted with malice, dishonesty, unfairness, or improper means to state a tortious interference claim. While departing DeWitt, Eisenberg capitalized on longstanding relationships in an industry of players who often repeat business, an action no different than when Eisenberg left Aon/AGRIS for DeWitt. See Cerberus Capital Mgmt., L.P. v. Snelling & Snelling, Inc., 12 Misc. 3d 1187(A) (N.Y. Sup. Ct. 2005) (holding that acting in "mere self-interest or other economic considerations" is "insufficient to support a claim for tortious interference").

Accordingly, Defendants' motion for summary judgment dismissing Count X is granted.

6.    Unjust Enrichment (Count XI)

DeWitt has asserted a claim for unjust enrichment against Eisenberg (Count XI), which requires it to establish "(1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." Golden Pac. Bancorp v. F.D.I.C., 273 F.3d 509, 519 (2d Cir. 2001) (citing Universal City Studios, Inc. v. Nintendo Co., 797 F.2d 70, 79 (2d Cir.

1986)). "'The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any agreement.'" Beth Israel Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., 448 F.3d 573, 586 (2d Cir. 2006) (quoting Goldman v. Metro. Life Ins. Co., 5 N.Y.3d 561, 572 (2005)). Separate from the already addressed book of business, DeWitt also alleges that, by paying compensation to Eisenberg and settling the litigation with Aon/AGRIS, Eisenberg has been unjustly enriched at DeWitt's expense. (See Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 24-26.)

The evidence does not establish this claim; rather, the evidence shows that all parties benefitted from the Settlement Agreement. The Settlement resulted in a release of Aon/AGRIS's claims against DeWitt as well as Eisenberg, and Eisenberg did not have a role in deciding the settlement amount to be paid. (Warshaw Decl., Ex. I at 2; Defs.' 56.1 ¶¶ 16, 94.) The Settlement Agreement permitted Eisenberg to lawfully solicit his former clients and develop them as DeWitt accounts. (See Pl.'s 56.1 ¶ 46.) Over the course of Eisenberg's employment at DeWitt, DeWitt paid Eisenberg compensation to generate commissions for DeWitt, which it is not disputed that Eisenberg did while employed. In such circumstances, good conscience does not require any return of money.

Accordingly, Defendants' motion for summary judgment dismissing Count XI is granted.

## 7.   Aiding and Abetting Liability (Count VIII)

DeWitt has alleged that a claim against AJG for aiding and abetting Eisenberg's breach of fiduciary duties to DeWitt (Count VIII). DeWitt grounds this claim in similar arguments made with respect to its claims of breach of fiduciary duty and duty of loyalty discussed above. (See Pl.'s Mem. in Supp. of Pl.'s Mot. for Summ. J. at 30-33.)

A claim of aiding and abetting requires a plaintiff to show: "(i) the existence of a fiduciary duty, (ii) a knowing breach of that duty, and (iii) damages resulting therefrom." Cohen v. Cohen, No. 09 Civ. 10230 (LAP), 2016 WL 2946194, at *11 (S.D.N.Y. May 19, 2016) (citing Johnson v. Nextel Commc'ns, Inc., 660 F. 3d 131, 138 (2d Cir. 2011)). For the reasons discussed above, there was no breach of fiduciary duty, and therefore no aiding of abetting of a non-existent breach.

Accordingly, Defendants' motion for summary judgment dismissing Count VIII is granted.

8.    DeWitt's Remaining Claims (Counts I and VI)

Because DeWitt's contract and common law claims are dismissed as set forth above, DeWitt is not entitled to any declaratory relief (Count I) under the Declaratory Judgment Act, 28 U.S.C. § 2201.

As to DeWitt's claim for injunctive relief (Count VI), DeWitt has failed to produce any evidence to show that Eisenberg misappropriated its confidential information or trade secrets or that Defendants will continue to do so three years after Eisenberg left DeWitt. In addition, the term of Eisenberg's covenant to not solicit DeWitt's clients using DeWitt's confidential information or trade secrets was two years, and has therefore expired. (Def. 56.1 ¶ 20.) As such, DeWitt cannot sustain the grounds for any preliminary or permanent injunctive relief (Count VI). Warner Bros. Entm't Inc. v. RDR Books, 575 F. Supp. 2d 513, 551-52 (S.D.N.Y. 2008) (requiring proof of suffering an irreparable injury; that remedies available at law are inadequate to compensate for that injury; that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and that the public interest would not be disserved by a permanent injunction).

Accordingly, for the reasons set forth above, Defendants'
motion for summary judgment dismissing Counts I and VI is
granted.

As DeWitt has not maintained its burden to establish
permanent injunctive relief, and as DeWitt has not refuted
Defendants' motion to dismiss the preliminary injunction, the
preliminary injunction that was issued at the outset of the case
is also dismissed. (See Dkt. 12.)

## DeWitt's Motion to Dismiss the Eisenberg Counterclaims is Granted

DeWitt has moved for summary judgment to dismiss
Eisenberg's counterclaims for breach of his 2007 Employment and
2012 Employment Contract, unjust enrichment for wages under New
York Labor Law, all based on the arrangement that had been
reached between DeWitt and the Fireman Fund which insured most
of Eisenberg's accounts at DeWitt. For the following reasons,
DeWitt's motion is granted.

### 1. Breach of Employment Agreement Counterclaim

Eisenberg has brought a counterclaim against DeWitt
alleging that DeWitt breached the 2007 and 2012 Employment

Agreements. As previously stated, a breach of contract under New York law requires: (1) the existence of an agreement; (2) adequate performance of the contract by the plaintiff; (3) breach of the contract by the defendant; and (4) damages. 24/7 Records, Inc. v. Sony Music Entm't, Inc., 429 F.3d 39, 42 (2d Cir. 2005) (citation omitted); CSI Inv. Partners II, L.P. v. Cendant Corp., 507 F. Supp. 2d 384, 413 (S.D.N.Y. 2007) (citations omitted).

To start, Eisenberg's initial counterclaims filing includes references to contractual terms that prohibited "unapproved deductions," which he claims he had not negotiated for upon being hiring in 2007. (Dkt. 61 ¶ 115.) However, no such terms were included in Eisenberg's employment agreement that he and his counsel negotiated. Rather, what is included in both Eisenberg's 2007 and 2012 Employment Agreements is a "merger" clause which precluded Eisenberg from arguing that other terms that were negotiated for should be considered part of those agreements. The 2007 Employment Contract provides that: "This letter agreement represents the entire agreement between you and DSG related to the subject matter herein and supersedes any negotiation, previous draft, agreements and otherwise, whether oral or written." (See Pl.'s 56.1 ¶ 105.) The 2012 Employment Agreement provides a similar provision:

> This Agreement and any Schedules attached constitute the entire understanding of the Parties with respect to the subject matter hereof, and supersede all prior and contemporaneous agreements, understandings, promises and representations relating to the subject matter hereof, written or otherwise. The provisions of this Agreement supersede any conflicting provisions of Company's Employee Handbook.

(Id.) These merger clauses require that solely the terms of the written agreements are what must control today. See Junk v. Aon Corp., No. 07 Civ. 4640 (LMM) (GWG), 2007 WL 4292034, at *3 (S.D.N.Y. Dec. 3, 2007) (finding that by signing an offer letter with a merger clause "Plaintiff explicitly agreed to forfeit any prior oral agreement between himself and Defendants").

Under the employment agreements themselves, Eisenberg contends that the compensation and profit-sharing DeWitt received breached the 2007 Employment Agreement because the contract discusses DeWitt's agreement not to interfere with the everyday conduct of Eisenberg's work in light of Eisenberg's professional experience, which Eisenberg claims hampered his ability to "negotiate optimally" his commissions, (Eisenberg Mem. in Opp. to Pl.'s Mot. for Summ. J. on Counterclaims at 8), and includes a provision noting that Eisenberg would not be required to "conduct [his] business in a manner that is

122

different from how [he] ha[d] conduct[ed] [his] business previously," (Biging Decl. Ex. X at 1). Neither argument is supportable by the evidence.

The employment agreements provide guidance as to Eisenberg's commission compensation arrangement. The 2007 Employment Agreement states a definition for "Net Base Commission" that excludes "insurer expense payments, override payments, profit sharing or any other additional compensation paid to [DeWitt] by insurers." (Biging Decl., Ex. X at 6.) The 2012 Employment Agreement likewise states various exclusions from "Net Commissions," such as "commission payable to sub-brokers, insurer expense payments, profit sharing, supplemental compensation and guaranteed payments paid to [DeWitt]." (Biging Decl., Ex. II at 2.) The clarity of the supplemental and contingent compensation arrangement with DeWitt is evidenced by, in addition to the terms' inclusion in Eisenberg's employment agreements, its reference in DeWitt's email signature blocks while Eisenberg was employed at DeWitt:

> DeWitt Stern is compensated through fees and/or commissions for services provided to clients. . . . In addition to this compensation, DeWitt Stern has agreement with most of its insurance markets through which it is compensated for insurance placed in these insurance markets. These payments are based upon such factors as the overall volume, growth, and profitability of the total premium placed with each

insurer. DeWitt Stern provides additional information about its compensation practices at the request of a client.

(Declaration of Charles Johnson dated November 8, 2016 ("Johnson Decl."), ¶ 7.)

Therefore, as to Eisenberg's interference claim, the proffered evidence establishes that under the terms of the employment agreements, DeWitt was entitled to such compensation as permitted by the above-mentioned "Net Base Commissions" and "Net Commissions" definitions. Engaging in conduct permitted and agreed to by Eisenberg does not constitute a breach of contract. Furthermore, Eisenberg received all of the "Net Base Commissions" he contracted for. Eisenberg's claims that he might have otherwise negotiated higher commissions but for the supplemental compensation agreements DeWitt had entered into with the insurers they placed business is speculation unsupported by submitted evidence.

As to Eisenberg's argument regarding the contractual provisions as to permitting his prior business manner conduct, that section does not relate to Eisenberg's compensation arrangement, which is detailed in a separately titled section of the 2007 Employment Agreement directly below. (See Biging Decl. Ex. X at 1.) To construe it as such would be outside the

"clearly expressed language of the contract" and, therefore, improper. See, e.g., Evans v. Famous Music Corp., 302 A.D.2d 216, 217, 754 N.Y.S.2d 259 (1st Dep't 2003) (collecting cases), aff'd, 1 N.Y.3d 452, 807 N.E.2d 869 (2004).

Lastly, Eisenberg has put forward arguments that DeWitt breached its duties of good faith and fair dealing with regard to its contractual obligations under the employment agreements, arguments never mentioned before. (See Eisenberg Mem. in Opp. to Pl.'s Mot. for Summ. J. on Counterclaims at 5-6.) Eisenberg's counterclaim cannot be reasonably construed to constitute such a claim. Under such the circumstances, the Court will not now consider an argument raised for the first time on summary judgment. See Rojo v. Deutsche Bank, 487 Fed. App'x 586, 588-89 (2d Cir. 2012) (summary order) (collecting cases holding that a district court may not consider a claim raised for the first time on summary judgment).

In short, the terms of the 2007 and 2012 Employment Agreements bar Eisenberg's contract counterclaim. Accordingly, Plaintiff's motion for summary judgment to dismiss Eisenberg's contractual counterclaims is granted.

## 2. Unjust Enrichment Counterclaim

Eisenberg has also brought a counterclaim against DeWitt alleging unjust enrichment with regard to DeWitt's commissions that Eisenberg alleges is outside the provisions of his employment agreements with DeWitt. (See Dkt. 61 at ¶¶ 121-25; Eisenberg Mem. in Opp. to Pl.'s Mot. for Summ. J. on Counterclaims at 9.)

As noted above, to state a claim for unjust enrichment in New York, a plaintiff must allege that: (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to the plaintiff." Golden Pac. Bancorp, 273 F.3d at 519 (quoting Universal City Studios, Inc., 797 F.2d at 79).

However, Eisenberg's counterclaim for unjust enrichment is premised upon the written employment agreements and the aforementioned breach of contract claim. And as has already been discussed above, an unjust enrichment claim cannot act as a surrogate for a breach of contract. "New York law does not permit recovery in [unjust enrichment], however, if the parties have a valid, enforceable contract that governs the same subject

matter as the [unjust enrichment] claim." Mid-Hudson Catskill
Rural Migrant Ministry, Inc. v. Fine Host Corp., 418 F.3d 168,
175 (2d Cir. 2005) (collecting cases); see also Surge Licensing,
Inc. v. Copyright Promotions, Ltd., 258 A.D.2d 257, 258, 685
N.Y.S.2d 175, 176 (1st Dep't 1999) ("[W]here, as here, there is
a valid contract governing the subject matter of the parties'
dispute, recovery in quasi contract for events arising out of
that same subject matter is precluded.").

No right for additional commission for Eisenberg has been
established, and his effort to increase his commission, was
successful but to his entire satisfaction. Eisenberg has
established only that he sought an increase in commission not
from the terms of the contract with DeWitt but from the insurer.
No duty of DeWitt or industry has been established which would
constitute unjust enrichment on the part of DeWitt.

Accordingly, Plaintiff's motion for summary judgment to
dismiss Eisenberg's unjust enrichment counterclaim is granted.

### 3. N.Y. Labor Law Counterclaim

Eisenberg has alleged that DeWitt violated New York Labor
Law based upon DeWitt's alleged failure to pay commissions as

"agreed-upon" and for having been "willful and without good
faith basis . . . for believing its underpayment of wages was in
compliance with the law." (Dkt. 61 at ¶ 129.)

N.Y. Labor Law § 191(1)(c) states that "[e]very employer
shall pay wages in accordance with the following provisions: . .
. A commission salesperson shall be paid the wages, salary,
drawing account, commissions and all other monies earned or
payable in accordance with the agreed terms of employment . . .
." N.Y. Lab. Law § 191(1)(c); see also Michalek v. Amplify
Sports & Entm't LLC, No. 11 Civ. 508 (PGG), 2012 WL 2357414, at
*4 (S.D.N.Y. June 20, 2012). Eisenberg contends that under this
law, commissions are considered "earned" at the time specified
in the employee's employment agreement and, once earned, those
commissions become regulated "wages." (See Eisenberg Mem. in
Opp. to Pl.'s Mot. for Summ. J. on Counterclaims at 10.)

Under New York Labor Law, wages are defined as "the
earnings of an employee for labor or services rendered,
regardless of whether the amount of earnings is determined on a
time, piece, commission or other basis." N.Y. Lab. Law § 190(1).
"Wages" as understood under the law, do not usually include
items like bonuses, profit-sharing, or other forms of incentive
compensation unless the incentive compensation is already

"earned" by the employee. See Truelove v. Northeast Capital &
Advisory, Inc., 95 N.Y.2d 220, 223-24, 738 N.E.2d 770, 715
N.Y.S.2d 366 (2000) (collecting cases). "An employee's incentive
compensation is 'earned' when the employee acquires a vested
interest in the award and its payment is not conditioned upon
some occurrence or left to the discretion of the employer."
Aledia v. HSH Nordbank AG, No. 08 Civ. 4342, 2009 WL 855951, at
*3 (S.D.N.Y. Mar. 25, 2009). "Bonuses and similar incentive
compensation generally become vested by contract or by the
awarding of a specified amount." Id. (quoting Truelove, 95
N.Y.2d at 223-24). Unearned incentive compensation, like
commissions, are therefore not wages, and thus the rules
governing restrictions on wage deductions do not apply. See Levy
v. Verizon Info. Servs., 498 F. Supp. 2d 586, 600 (E.D.N.Y.
2007); see also N.Y. Lab. Law § 193.

    As set forth above, the 2007 Employment Agreement provides
that "Net Base Commissions" is defined as commissions and fees
actually received, retained, and earned by DeWitt, excluding
insurer expense payments, override payments, profit sharing or
any other additional compensation paid to DeWitt by insurers.
The 2012 Employment Agreement similarly states that the term
"Net Commissions" does not include insurer expense payments,
profit sharing, supplemental compensation and guaranteed

payments paid to DeWitt, or commissions payable to sub-brokers. These "Net Commissions" are not deemed earned until received by DeWitt. Bonuses, such as the ones at issue, are based on the DeWitt's financial success rather than Eisenberg's performance and are thus not considered wages and fall outside the Labor Law's parameters. See Truelove, 95 N.Y.2d at 223-24.

Eisenberg's employment agreements lay out the parameters of Eisenberg's compensation, and nothing in the Labor Law precludes the commission's structure to which DeWitt and Eisenberg expressly agreed. See Levy, 498 F. Supp. 2d at 601 ("Where a compensation plan provides that incentive compensation is not earned until the end of a production period-when appropriate adjustments can be made to calculate the 'net figure[s]' to which employees are entitled-the incentive compensation does not vest, and thus does not qualify as 'wages,' until after the amounts due are determined." (citing Dean Witter Reynolds Inc. v. Ross, 75 A.D.2d 373, 429 N.Y.S.2d 653 (1st Dep't 1980)).

Given the terms of the 2007 and 2012 Employment Agreements, the N.Y. Labor Law in applicable. Accordingly, Plaintiff's motion for summary judgment to dismiss Eisenberg's labor law counterclaim is granted

## The Daubert Motion to Exclude the O'Neill Testimony and Report is Moot

Defendants have moved to exclude the expert report and testimony offered by DeWitt of its damages expert, Pamela M. O'Neill.

Given that DeWitt's claims have been dismissed as set forth above, the O'Neill Testimony and Report are moot and the motion is thereby dismissed.

**Conclusion**

For the foregoing reasons, Defendants' motion for summary

judgment is granted, Plaintiff's motion for summary judgment is

denied, Plaintiff's motion for summary judgment on Defendants'

crossclaims is granted, and Defendants' motion to exclude the

O'Neill Testimony and Report is dismissed as moot.

It is so ordered.

**New York, NY**
**June 23, 2017**

ROBERT W. SWEET
U.S.D.J.